The LONG ISLAND RAIL ROAD CO., Plaintiff,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, et al., Defendants.

METRO–NORTH COMMUTER RAILROAD CO., Plaintiff,

v.

INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS, et al., Defendants.

NJ TRANSIT RAIL OPERATIONS, INC., Plaintiff,

v.

The BROTHERHOOD OF RAILROAD SIGNALMEN, et al., Defendants.

NATIONAL RAILROAD PASSENGER CORP., Plaintiff,

v.

AMERICAN RAILWAY AND AIRWAY SUPERVISORS ASSOCIATION, et al., Defendants.

Nos. 89 Civ. 1536 (RPP), 89 Civ. 1535 (RPP), 89 Civ. 1516 (RPP) and 89 Civ. 1504 (RPP).

United States District Court, S.D. New York.

March 14, 1989.

Proskauer Rose Goetz & Mendelsohn, New York City (Bernard M. Plum, of counsel), for Metro–North and Long Island Rail Road.

Guerrieri, Edmond & James, P.C., Washington, D.C. (John Edmond, Richard Ruda, of counsel), Vladeck, Waldman, Elias & Engelhard, P.C., New York City (Sheldon Engelhard, of counsel), Reitman, Parsonnet, Maisel & Duggan, Newark, N.J. (Bennet D. Zurofsky, of counsel), for union defendants.

Shapiro, Shiff, Beilly, Rosenberg & Fox, New York City (Sidney Fox, of counsel), for United Transportation Union.

Baptiste & Wilder, P.C., Washington, D.C. (Roland P. Wilder, Jr., of counsel), for Local 808, Intern. Broth. of Teamsters.

Siff, Rosen & Parker, P.C., New York City, Sally D. Garr, Washington, D.C. (Mark S. Landman, William G. Ballaine, New York City, of counsel), for Amtrak.

Robert H. Stoloff, Rebecca Fields, Deputy Attys. Gen., Trenton, N.J., for NJ Transit.

## OPINION AND ORDER

PATTERSON, District Judge.

These motions for preliminary injunctions were brought on by (a) orders to show cause signed by the Court on March 5, 1989 after a six-hour hearing on March 4, 1989 at which counsel for plaintiffs Metro–North Commuter Railroad Co. (Metro–North), the Long Island Rail Road Co. (LIRR) and NJ Transit Rail Operations, Inc. (NJT) and counsel for defendants presented arguments to the Court, and (b) an order to show cause signed by the Court on March 6, 1989, after hearings on March 5, 1989 and March 6, 1989 at which counsel for plaintiff National Railroad Passenger Association (Amtrak) and counsel for defendants presented arguments to the Court. Each order to show cause contained a temporary restraining order against defendants ordering them not to engage in a sympathy strike or other concerted labor activity against the plaintiff in connection with the threatened picketing of plaintiffs' premises by members of defendant International Association of Machinists and Aerospace Workers (IAM), which has been engaged in a bitter strike against Eastern Air Lines and which also represents employees of each the plaintiffs.

Each order to show cause was made returnable on March 8, 1989 at 2:00 p.m. On March 7, 1989, the Court, *sua sponte*, extended the temporary restraining orders until midnight on March 10, 1989. Evidentiary hearings, including arguments on the law, on the motions for preliminary injunctions, were held on March 8 and 9, 1989 in a consolidated hearing for all four cases. On March 10, 1989 the temporary restraining orders were extended until the issuance of this opinion and order. All the plaintiffs are carriers by rail and bring these motions for a preliminary injunction, pursuant to complaints that seek that relief under the Railway Labor Act (RLA), 45 U.S.C. § 151 *et seq.*[1]

This opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## Jurisdiction and Venue

Jurisdiction of these actions is founded on 28 U.S.C. §§ 1331, 1337. Venue lies in the Southern District of New York, as plaintiffs have each presented evidence establishing that they have substantial operations in this district and that the threatened acts of defendants will occur in this district. 28 U.S.C. § 1391(b).

## The Parties

### A. Metro–North

Metro–North operates commuter rail service on behalf of the Metropolitan Transportation Authority and the Connecticut Department of Transportation. Its operations include rail lines, known as the Hudson, Harlem and New Haven Lines. It operates some 525 trains daily into and out of Grand Central Terminal that carry approximately 85,000 daily commuters.

Metro–North had collective bargaining agreements negotiated under the RLA with all of the union defendants named in its complaint. With the exception of the agreement with Local 808, International Brotherhood of Teamsters (Local 808), all of the collective bargaining agreements became effective on January 1, 1986 and became amendable on January 1, 1989. Local 808 has not entered into a new collective bargaining agreement since its service of a notice pursuant to § 6 of the RLA, prior to the expiration of its prior agreement on December 31, 1985, but has not been released from mediation before the National Mediation Board. All of the other defendant unions sued by Metro–North in this action have served notices pursuant to § 6 of the RLA indicating their intention to make changes in rates of pay, rules and working conditions. The service of the § 6 notices has the effect of making Metro–North and all of the defendant unions subject to the status quo requirements of the

---

1. NJT filed an amended complaint on March 6, 1989, adding five unions as defendants. Counsel have stipulated that those defendants will be bound by this decision.

RLA, preventing the unilateral change of rates of pay, rules or working conditions.

### B. LIRR

The LIRR operates commuter rail service on behalf of the Metropolitan Transportation Authority. It operates some 727 trains daily into and out of Pennsylvania Station that carry approximately 272,000 daily commuters. The LIRR also carries freight in interstate commerce and is an integral part of the national railway system.

The LIRR has collective bargaining agreements negotiated under the RLA with all the defendant unions named in its complaint which continue in effect until June 30, 1989. Pursuant to the moratorium provisions in these agreements, § 6 notices indicating the intention to make changes in rates of pay, rules and working conditions, were served in January 1989, but are not effective until June 30, 1989.

### C. NJT

NJT, an instrumentality of the State of New Jersey, operates 565 daily trains on ten rail lines which account for approximately 186,000 one-way daily passenger trips (approximately 93,000 round-trip passengers). The destination of most NJT passengers is New York City, with Northeast Corridor trains (NJT's most heavily travelled line) and North Jersey Coast Line Trains terminating in Penn Station, Manhattan. Other service has terminals in Newark and Hoboken, New Jersey from which passengers may transfer to PATH lines to New York City. In addition to the terminals at Newark and Hoboken, New Jersey, other New Jersey locations and Penn Station, New York, NJT operates service that originates in Port Jervis, Suffern and Spring Valley, New York and provides service to other Rockland County, New York communities. NJT has 4,000 employees, 3,500 of whom are represented by unions.

NJT has collective bargaining agreements negotiated under the RLA in full force and effect with each of the defendant unions named in its complaint.

### D. Amtrak

Amtrak is engaged in the rail transportation of passengers, mail and express packages in intrastate and interstate commerce throughout the continental United States. It operates 100 passenger trains per day in the Northeast corridor, including approximately 70 trains per day between Washington, D.C. and Philadelphia; 84 trains (including the 70 trains above) per day between Philadelphia and New York, and 20 trains between New York and Boston. In addition, Amtrak operates key components of rail lines which the other railroad plaintiffs in the Northeast corridor operate.

Amtrak has collective bargaining agreements, in full force and effect, negotiated under the RLA with each of the defendant unions named in its complaint.

### E. Defendants

Defendants in the Metro–North complaint are International Association of Machinists & Aerospace Workers (IAM), American Railway and Airway Supervisors Associations (ARASA), American Train Dispatchers Association (ATDA), Brotherhood of Railroad Signalmen (BRS), Brotherhood of Locomotive Engineers (BLE), International Brotherhood of Electrical Workers (IBEW), Local 495, Hotel & Restaurant Employees Bartenders International Union (Local 495), International Brotherhood of Boilermakers, Iron Ship Builders, Blacksmiths, Forgers & Helpers (IBB), International Brotherhood of Firemen & Oilers (IBF & O), Local 808, International Brotherhood of Teamsters (Local 808), Sheetmetal Workers International Association (SWIA), Transport Workers Union of America (TWU), Local 1460, Transport Workers Union (Local 1460), Transportation Communication International Union (TCIU), TCIU–TC Division and the United Transportation Union (UTU) (collectively, the "Metro–North unions"). Collective bargaining agreements set forth the terms and conditions of employment of the Metro–North employees represented by those unions. (Ex. 69–89; Tr. 14)

The LIRR has collective bargaining agreements with defendants IAM, ARSA, BRS, BLE, IBEW, IBF & O, SWIA, UTU, TCU and the National Transportation Supervisors Association (NTSA) (collectively, the "LIRR unions"), which set forth the terms and conditions of employment of the LIRR employees represented by those unions. (Ex. 30–40, 93–95; Tr. 14)

NJT has collective bargaining agreements with defendants IAM, ARASA, ATDA, BRS, IBEW, IBB, IBF & O, SWIA, TWU, TCIU, BLE, three divisions of the UTU; UTU–Yardmasters (UTU–Y), UTU–Trainmen (UTU–T), Brotherhood of Railway Carmen, a Division of TCU (BRC) and the Brotherhood of Maintenance of Way Employees (BMWE) (collectively, the "NJT unions") (NJT–15), which set forth the terms and conditions of employment of the NJT employees represented by those unions.

Amtrak has collective bargaining agreements with defendants ARASA, Amtrak Service Workers Council, ATDA, BLE, IBB, IBEW, IBF & O, Railroad Yardmasters of America (RYA), SWIA, TCU and UTU (collectively, the "Amtrak unions"), which set forth the terms and conditions of employment of the Amtrak employees represented by those unions.

### The Threat of Picketing

The IAM, through its District Lodge 100, represents employees of Eastern Air Lines, a carrier by air within the meaning of the RLA, 45 U.S.C. § 181. The IAM and Eastern have been engaged in negotiations over changes in their collective bargaining agreement since November 1987. On January 31, 1988, the National Mediation Board (NMB) declared the Eastern–IAM negotiations to be at an impasse and proffered arbitration pursuant to RLA § 5 First, 45 U.S.C. § 155 First. Eastern rejected the offer of arbitration and the 30–day cooling off period prescribed by the RLA began. The IAM-represented employees of Eastern struck at 12:01 a.m. on March 4, 1989, the expiration of the cooling off period prescribed by the RLA.

On or about February 2, 1989, in a letter sent to the NMB by William W. Winpisinger, International President of the IAM, the IAM informed the NMB that it would engage in secondary picketing in the air, rail and manufacturing industries.

The IAM has actively sought the support of the defendant unions in urging, encouraging and instructing employees represented by those unions not to cross IAM picket lines. (Tr. 14, 57–63, 118) [2] Prior to the granting of a temporary restraining order on March 5, the IAM bargaining units at the LIRR, through their local chairmen, had been aiding the Eastern machinists in their plan to disrupt railroad operations. This aid included, *inter alia*, providing Eastern IAM officials with information regarding LIRR trainyards, including maps and directions, to assist it in picketing the LIRR. (Tr. 58–60)

The defendants have stipulated in this action that picketing and secondary activity by IAM against plaintiffs was and is a real threat on the part of IAM and is still part of IAM's strike strategy. (Tr. 118) At the hearing on March 9, 1989, defendants' counsel were asked to advise the Court if the filing of Chapter 11 bankruptcy reduced this threat and have not done so.

### Prospective Sympathetic Action

All of the defendant unions except the UTU defendants have stipulated that if IAM picket lines are established at the facilities and/or properties of the plaintiff railroads, these defendants will urge and encourage all union members employed by the plaintiff railroads to refuse to cross those IAM picket lines. (Tr. 14)

All defendants have stipulated that if the defendant unions urge and encourage their members to honor IAM picket lines, the members are not likely to cross those lines and the plaintiff railroads will be forced to cease operation. (Tr. 14–15)

The UTU defendants have stipulated that if IAM picket lines are established at the facilities and/or properties of the plaintiff railroads, the UTU defendants will act to protect and defend the rights of their mem-

2. This refers to the transcript of hearings held March 9 and 10, 1989, and pages thereof.

bers not to cross the picket lines. These defendants also concede that no member of the UTU ever has crossed a picket line. In their view, their members do not require instructions not to cross picket lines and there is no evidence to establish that the UTU has ordered its members not to cross picket lines or IAM's lines under threat of discipline. However, Chairman Yule of the UTU has asked his union members to honor the picket lines.

In response to this IAM threat, and to the call for support made by the IAM to defendant unions, all defendant unions other than UTU have urged, encouraged and in some instances directed their members not to cross an IAM picket line. (Tr. 14, 137–39; Ex. 13, 16, 19, 64, 93; Ex. C and D. to Bergen Aff.) General Chairman Hanley of the TCU, for example, testified that he had received a directive from the International TCU, sent to all offices and General Chairmen, telling them to instruct their members to support, and not cross, an IAM picket line. (Tr. 156–63) Mr. Hanley also testified that he has advised his local chairman that any member of the TCU who crossed an IAM picket line is "no better than a scab." (Tr. 162–163) Chairman Hanley stated that it was in the interest of his union to have the tactics of somebody like Lorenzo stopped; that if those tactics are not stopped they will carry over into his union's negotiations with the LIRR. (Tr. 154)

At least some of the union constitutions and bylaws, e.g., those of the IBT, IAM, UTU and TCU, contain disciplinary procedures, including the imposition of fines and expulsion from membership, against union members for various activity. (Tr. 135, 160–63, 178–80; UTU Ex. 1 at 70) The testimony showed that such discipline could be imposed on union members who cross a picket line and that at least one union (TCU) conveyed to members that they would be fined two days pay for each day worked while a picket line was in place, but there was no evidence of such penalties being actually imposed. (Tr. 136–37; 160–62; 178–80)

Additional, unrebutted evidence, contained in Amtrak's Fagnani affidavit, is admissible under *SEC v. Frank*, 388 F.2d 486 (2d Cir.1968). On Friday, March 3, 1989, Amtrak's Director of Labor Relations, Joseph M. Fagnani, talked with C.P. Jones, the UTU General Chairman who represents train service employees in Amtrak's Northeast Corridor work zone 2 and in Amtrak's Off–Corridor work zones. Mr. Jones stated flatly that the employees he represents would not cross picket lines set up by Eastern Air Lines employees at Amtrak locations. (Amtrak's Fagnani Aff., ¶ 2) Mr. Fagnani also spoke that day with Mr. W.A. Beebe, the UTU General Chairman who represents train service employees in Amtrak Northeast Corridor work zone 1. He also stated that employees they represent would not cross picket lines set up by Eastern employees at Amtrak locations. (Amtrak's Fagnani Aff., ¶ 3).

A labor organization's commitment to "urge and encourage" or "protect and defend" a concerted refusal by union members to cross IAM picket lines can include the use of communications which in fact are subtle signals to convey the message to not report for work. *Complete Auto Transit Inc. v. Reis*, 451 U.S. 401, 418 n. 1, 101 S.Ct. 1836, 1846 n. 1, 68 L.Ed.2d 248 (1981). In this connection, the court has considered the following:

(i) The UTU General Chairman for the LIRR sent a letter, dated March 3, 1989, addressed to union members warning that "it would not be safe" to cross any picket lines manned by I.A.M. workers. (Yule letter dated March 3, 1989, Ex. to Cohen Aff.);

(ii) On March 3, TCU representatives for Amtrak employees at One Penn Plaza in New York, across the street from Penn Station, warned assembled employees that any union members who failed to honor a picket line would be fined one day's pay for one day's work (Tr. 83);

(iii) On March 7, a notice was found posted on the bulletin board at the ARSA [sic] foreman's offices in Amtrak's maintenance facility in Chicago warning employees that BRAC (now the TCU of which ARSA is a division) has a tradition

of respecting picket lines established by other labor unions and that any member who fails to do so will be subject to being charged with a violation of the "policies and laws of our Brotherhood," and if charged and found guilty, will be subject to a fine of not less than the amount earned by the member for each day the member worked during the picketing or strike. (Tr. 92–94; Amtrak ex. 26; *see* Tr. 152, 160.)

(iv) On March 3, a notice was found posted on the bulletin board in the Amtrak employee's lunchroom in Washington, D.C., warning that the Brotherhood of Locomotive Engineers will support and, "if necessary, place the full power of the B. of L.E. behind the members of the B. of L.E., who because of *fear* of hazard or injuries to themselves or families or *damage to their personal property decline to cross picket lines*" (emphasis in original). (Tr. 86, 87; Amtrak ex. 25.)

(v) The TCU General Chairman for the LIRR publicly proclaimed that any union member who crossed the picket line is "no better than a scab." His statement was quoted in a widely-circulated local newspaper, Newsday, on March 5. This union official also admitted in testimony that the penalty for crossing a bona fide picket line is two days pay for each day's work. (Tr. 161–64; *see* Tr. 23, 25–27; ex. 19.)

(vi) Whether accurate or not, a widely-read New York newspaper, the New York Post, quoted UTU General Chairman of the LIRR on March 3 as warning: "It's unsafe to cross picket lines because it can get bloody." (Ex. to LIRR's Cohen Aff.)

(vii) The union representative of the American Train Dispatchers Association (ATDA) in New York warned an Amtrak dispatcher on March 3 that if a union member crossed the picket line he would be expelled from the union. If expelled, an ATDA member could no longer work as a train dispatcher for Amtrak. (Tr. 89–91.)

(viii) The testimony of Mr. Pokoj of the Teamsters Union that, as union representative, he would not instruct the union's members to honor the IAM picket lines but that he would volunteer his personal view to that effect.

### Potential Impact

If an IAM picket line is established at the premises and property of plaintiffs, the union members are not likely to cross, particularly if their unions have urged, encouraged and/or instructed them not to do so, which action will cause plaintiffs to cease operations. None of the railroads can operate if members of the UTU fail to report for work. (Tr. 247, 260) Credible evidence was adduced at the hearing that if a single union did not report for work the railroad would be forced to cease operations. In view of the other unrefuted evidence that, since most of the union defendants represent employees of all four carrier plaintiffs, and as Metro–North, LIRR and NJT interconnect and share some common facilities with Amtrak, the honoring of the IAM's picket lines by any one of the defendant unions against any one of the plaintiff carriers could, in all probability, cause that carrier to cease operations and the other plaintiff carriers as well.

Indeed, because of the operational interrelationship between Amtrak's intercity service and local commuter services, if any of the defendant unions' members honor Eastern picket lines and do not report to work, it would virtually prevent all passenger rail traffic from moving between cities on the Northeast Corridor, as well as into and out of most major cities in the northeast and elsewhere. (Amtrak's Larson Aff., ¶¶ 2–3.)

### The Collective Bargaining Agreements

Plaintiffs all contend that the purposes of the RLA will be violated if the threatened picketing occurs or if the threatened concerted sympathetic action by defendants and their railroad employees honoring those picket lines takes place.

Their contentions are based on the statutory design of the RLA and the provisions in the collective bargaining agreements they have with the defendants in their ac-

tions. The defendants claim the threatened actions are permitted under the RLA by decisional precedent and that the collective bargaining agreements permit them to take collective action honoring the picket lines. None of the collective bargaining agreements have "no strike-no lockout" provisions nor do they contain a provisions permitting or prohibiting the honoring of picket lines. *Cf. Trans Int'l Airlines v. International Bhd. of Teamsters,* 650 F.2d 949, 964, n. 11 (9th Cir.1980), *cert. denied,* 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981).

Plaintiffs rely on the following provisions of their collective bargaining agreements to prevent the threatened sympathy strike and other concerted sympathy action.

A.  Metro–North

Each of the collective bargaining agreements between Metro–North and the defendant Metro–North unions contains a broad grievance and arbitration provision requiring the parties to submit all disputes over the application and interpretation of the agreement to arbitration. (Ex. 69–89; Tr. 14)  Each of the collective bargaining agreements between Metro–North and the Metro–North unions contains provisions which, expressly or by implication, require employees to report for work as their assignments dictate, and which prohibit employees from absenting themselves from work unless expressly authorized by the applicable agreement or by Metro–North. (Ex. 69–89; Tr. 14)

Metro–North's Rules of the Operating Department, General Rules S and T, applicable to all train and engine service employees, expressly require that Metro–North "employees must not engage in any type of ... activity which interferes with ... performance of their railroad duties." (Ex. 92; Tr. 14)

Metro–North's written policy on attendance, which applies to all Metro–North employees, provides that the obligation "to report to work (for duty) as scheduled, at the proper location, at the start of his/her tour of duty (workday) and to remain on duty for the full tour" is "the most important basic obligation an individual assumes as a condition of employment with Metro–North." (Ex. 91; Tr. 14)

Arbitrators' awards obtained by Metro–North have confirmed the existence of this fundamental obligation by Metro–North employees. (Ex. 66–68)

Taken together, the collective bargaining agreements and the other "incidents of employment," (*e.g.,* arbitration awards, operating rules and the attendance policy) require Metro–North employees to report to work each day unless specifically excused. (Ex. 66–89, 91–92)

B.  LIRR

Each of the collective bargaining agreements between the LIRR and the defendant LIRR unions contains a broad grievance and arbitration provision requiring the parties to submit all disputes concerning the application or interpretation of those agreements to arbitration. (Ex. 30–40; 93–95; Tr. 14)  Each of the collective bargaining agreements contains provisions which, expressly or by implication, require employees to report to work as their assignments dictate, and prohibit employees from absenting themselves from work, unless expressly authorized by the applicable agreement or by the LIRR. (Ex. 30–40, 93–95; Tr. 14) There is no provision in any of the LIRR's various collective bargaining agreements that permit employees to fail to report for work because of the establishment of a picket line. (Ex. 30–40, 93–95)

The obligation of LIRR employees to appear for work has also been established in a series of arbitration decisions that repeatedly have held that LIRR employees are obligated to appear for work as assigned. (Ex. 24–29)

Taken together, the collective bargaining agreements and the other "incidents or employment," (*e.g.,* arbitration awards), require LIRR employees to report to work each day unless specifically excused. (Ex. 24–40, 93–95; Tr. 14)

## C. NJT

Each of the collective bargaining agreements between NJT and the defendant NJT unions contains a grievance and arbitration provision requiring the parties to submit their disputes to arbitration. Each of the collective bargaining agreements between NJT and the NJT unions contains numerous provisions requiring employees to report for work as their assignments dictate.

NJT's Operating Rules applicable to train and engine service employees and Maintenance of Equipment Rules applicable to mechanical employees contain an express requirement that "employees must refrain from conduct which adversely affects the performance of their duties" (Operating Rule D and Mechanical Rule 33) and that "Employees must report to work at the required time." (Operating Rule T and Mechanical Rule 44) (NJT exs. 64 and 65)

The obligation of NJT employees to appear for work has also been established in a series of arbitration decisions that repeatedly have held that NJT employees are obligated to appear for work as assigned. (NJT exs. 24 through 63)

NJT has by written communication advised the defendant unions of NJT's position that, under its collective bargaining agreements with defendant unions, a refusal to cross IAM picket lines is prohibited. (NJT exs. 66 through 77) NJT has further requested a conference over any dispute regarding the interpretation of the collective bargaining agreement so that the matters may be submitted to the appropriate division of the National Railway Adjustment Board.

## D. Amtrak

Amtrak's collective bargaining agreements with the defendant Amtrak unions require that the Amtrak employees represented by those unions will report for work as assigned. In return, Amtrak agrees to pay them certain wages and to provide other benefits. (Amtrak exs. 1–23, 1A–23A)

Amtrak has twenty-three different collective bargaining agreements, all of which require that Amtrak employees represented by those unions report for work as assigned with the fourteen defendant Amtrak unions. All of the agreements also have detailed provisions enumerating the circumstances under which employees are relieved of their obligation to report to work, including, e.g., sickness, jury duty, bereavement, leave of absence, personal holiday rest days, holidays and military leave. Ten of the agreements, involving eight unions, also contain a provision similar to this: an employee "shall not absent himself from his assigned position for any cause without first obtaining permission from his supervisor." (Amtrak exs. 1A, 2A, 3A, 7A, 12A, 13A, 14A, 15A, 16A, 17A) The remaining thirteen agreements, involving seven unions, enumerate in detail the reasons an employee may be absent from work. (Amtrak exs. 4A, 5A, 6A, 8A, 9A, 10A, 11A, 18A, 19A and 20A) None of the agreements contain a provision which permit employees to absent themselves from duty because they are honoring a picket line or engaging in a sympathy strike. (Amtrak exs. 1–23, 1A–23A)

Each of the collective bargaining agreements between Amtrak and defendant unions provides for a comprehensive procedure for the adjustment of grievances that incorporates the Railway Labor Act's mandatory procedures for the adjustment of "minor disputes." (Amtrak exs. 1–23, 1A–23A)

In addition, all Amtrak employees, including all members of the defendant unions employed by Amtrak, are bound by the provisions of Rule of Conduct O, which expressly provides that "[e]mployees must report for duty at the designated time and place ... employees may not be absent from their assigned duty ... without permission from their supervisor." There is no exception in Rule O authorizing employees to honor the picket lines of others, and Amtrak has disciplined employees for engaging in illegal strike activity pursuant to these rules. (Amtrak ex. 24)

The defendants contend that since none of the collective bargaining agreements

contains a no-strike provision, the parties did not intend to prevent such action. They also claim sympathy strikes were permitted by the parties during the existence of the labor agreements. In both regards, the defendants' evidence was not comprehensive and inconclusive, and considerable factual evidence remains to be gathered and presented with respect to each of the more than eighty collective bargaining agreements at issue. Furthermore, even assuming the correctness of defendants' position, it seems clear based on counsel's concession at the hearing (Tr. 329–33) that sympathy strikes of the sort contemplated, i.e., in support of a union's dispute in another industry, were not permitted under the instant collective bargaining agreements since cross industry secondary picketing, the type contemplated here, was not considered legal until after *Burlington Northern,* discussed *infra.*

In the light of the foregoing the Court finds that the collective bargaining agreements are reasonably susceptible to the plaintiffs' interpretation that there is no right of defendants to engage in the contemplated sympathetic action under any of the collective bargaining agreements in issue.

## Review of the Law

The Railway Labor Act (RLA) is a unique law. In his dissent in *Elgin J. & E. Ry v. Burley,* Mr. Justice Frankfurter described it "as primarily an instrument of government." 325 U.S. 711, 752, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting). Its first enactment in 1926 was "legislation agreed upon by the railroads and its unions and probably unique in having been frankly accepted as such by the President and Congress." *Id.* at 753, 65 S.Ct. at 1304. The 1934 amendment of the RLA was designed toward still greater self-government. *Id.*

Soon after the passage of the RLA, the Supreme Court stated that the major purpose of Congress in passing the RLA in 1925 was "to provide a machinery to prevent strikes." *Texas & N.O. Ry. v. Railway Clerks,* 281 U.S. 548, 565, 50 S.Ct. 427, 432, 74 L.Ed. 1034 (1930).

Indeed, the first stated general purpose of the Act is "to avoid any interruption to commerce or the operation of any carrier engaged therein." 45 U.S.C. § 151a(1).

Consistent with the general purpose of the RLA stated in § 151a, the next following section places a duty on:

all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and *to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier* growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152 First (emphasis added). Thus, "the duty" imposed by this section requires the settlement of all disputes "whether arising out of the application of such agreements *or otherwise* " (emphasis added). Notably, the purpose of avoiding "any interruption to commerce or to the operation of any carrier" is then reiterated.

In order to effectuate that purpose, Congress constructed the RLA to provide an elaborate arbitration and mediation process designed to settle all "minor" and "major" disputes between carriers and their employees. *Elgin J. & E. Ry. v. Burley,* 325 U.S. 711, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945); *see also Local 553, Transp. Workers Union of Am. v. Eastern Air Lines, Inc.,* 695 F.2d 668, 673 (2d Cir.1983). "Minor disputes" growing out of the interpretation of agreements concerning "rates of pay, rules or working conditions" are to be settled before the National Railway Adjustment Board. 45 U.S.C. § 153 First (i). "Major disputes" are to be brought before the NMB. Major disputes include "any other dispute not referable to the National Railway Adjustment Board." 45 U.S.C. § 155 First (b). The Act's arbitration and mediation processes contain "an implicit status quo requirement central to its design," *Detroit & Toledo Shore Line R.R. v. United Transp. Union,* 396 U.S. 142, 150, 151, 90 S.Ct. 294, 299, 300, 24 L.Ed.2d 325 (1960), which is "the heart of the Railway Labor

Act." *Brotherhood of Ry. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 377, 89 S.Ct. 1109, 1114, 22 L.Ed.2d 344 (1969). While disputes are working their way through the arbitration or mediation process, neither party may unilaterally alter the status quo. *Id.* at 378, 89 S.Ct. at 1115; *see Brotherhood of Locomotive Eng'rs v. Louisville & Nashville R.R.,* 373 U.S. 33, 38, 39, 83 S.Ct. 1059, 1062, 1063, 10 L.Ed.2d 172 (1963). Indeed, a union will be enjoined from striking until all the statutory procedures for settling the dispute have been exhausted. *Chicago N.W. Ry. v. United Transp. Union,* 402 U.S. 570, 91 S.Ct. 1731, 29 L.Ed.2d 187 (1971); *Local 553 v. Eastern Air Lines,* 695 F.2d at 675.

Once the statutory settlement procedures have been unsuccessfully exhausted, however, it is lawful for the carrier and the unions to engage in self-help by unilaterally changing working conditions or striking, as the case may be. *Local 553 v. Eastern Air Lines,* 695 F.2d at 675; *Burlington Northern R.R. v. Brotherhood of Maintenance of Way Engineers,* 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987); *Brotherhood of Ry. Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 378–79, 89 S.Ct. 1109, 1115–16, 22 L.Ed.2d 344 (1969). Indeed, an RLA union is then free to engage in secondary picketing, *Burlington Northern, supra,* which is a form of economic self-help denied to those unions subject to the National Labor Relations Act, 29 U.S.C. § 151 *et seq. Burlington Northern, supra; see also Brotherhood of Ry. Trainmen v. Jacksonville Terminal Co., supra.* But prior to that time no such action may be taken. As Mr. Justice Harlan stated in *Brotherhood of Ry. Trainmen v. Jacksonville Terminal Co., supra,* 394 U.S. at 378, 89 S.Ct. at 1115: "While the dispute is working its way through these stages, neither party may alter the *status quo.* §§ 2 Seventh, 5 First, 6, 10." Furthermore, failure to initiate the procedures of the Act for minor or major disputes before resort to

self help measures is enjoinable. *Long Island R.R. v. System Fed'n No. 156,* 368 F.2d 50 (2d Cir.1966).

### Conclusions of Law

■ Here the actions threatened by defendants are twofold. First, defendant IAM is threatening to set up picket lines at strategic locations at or adjacent to plaintiffs' key operational points. Second, all the defendant unions and their officers either have already instructed their members to honor such picket lines or have acknowledged that they will urge their members to take similar action to evoke a sympathy strike or concerted labor activity which effectively would close down plaintiffs' operations.[3] Consistent with the provisions in its Temporary Restraining Orders, the Court is not persuaded that any injunction should issue to prevent the first threatened action in view of the holding in *Burlington Northern, supra.* If the right to engage in secondary picketing should not extend from the airline industry to the rail industry (cross industry secondary picketing), it is for Congress or a higher court to make that decision.

■ With respect to the second threatened action, however, the Court finds that the purposes of the RLA "to avoid any interruption of commerce or the operation of a carrier" and the Act's imposition of a duty requiring the exhaustion of settlement procedures as articulated under precedent would be a nullity were a temporary injunction not to issue.

Under the RLA, all the collective bargaining agreements between the plaintiffs and defendants, although many are in different status, are still in a status pursuant to which they remain binding on the parties. Under all those agreements, there is an inherent contractual commitment by union management on behalf of its members to supply the labor force in its particular craft or trade for the running of the rail-

---

**3.** One defendant, the UTU, has taken the position that it will not urge its members to honor the picket lines but that its members are likely to do so without urging. There was evidence

showing that Mr. Yule, its General Chairman, advised its members not to cross the IAM picket lines due to the danger to union members and their families. (Ex. 22)

roads.[4] In addition, if a union encouraged a concerted failure of a union's members to report for work, its statutory "duty to maintain agreements" under 45 U.S.C. § 152 First would be violated.

Failure to observe the duty to exert every reasonable effort to "make and maintain agreements," 45 U.S.C. § 152 First, constituted the basis for the injunctions in *Piedmont Aviation, Inc. v. ALPA*, 416 F.2d 633 (4th Cir.1969); *Southern Ry. v. Brotherhood of Locomotive Firemen*, 384 F.2d 323, 328 (D.C.Cir.1967); *Long Island R.R. v. System Fed'n No. 156*, 368 F.2d 50 (2d Cir.1966); *Ozark Air Lines, Inc. v. ALPA*, 361 F.Supp. 198, 201 (E.D.Mo.1973). Indeed, "such a remedy is the only practical, effective means of enforcing the duty to exert every reasonable effort to make and maintain agreements." *Chicago N.W. Ry. v. United Transp. Union*, 402 U.S. 570, 583, 91 S.Ct. 1731, 1738, 29 L.Ed.2d 187 (1971).

As the findings of fact indicate in all four cases under decision, there is no so-called "no strike" provision in any of the numerous collective bargaining agreements with the defendant unions involved in the operations of the plaintiffs' railroads. Nor is there any provision in any of the collective bargaining agreements prohibiting or permitting the employees to honor picket lines. Instead, the collective bargaining agreements contain a variety of affirmative obligations of the employer and the union employees involved, which assume a regular and on-going working relationship. The plaintiffs contend that prohibitory "no strike type" language is unnecessary in view of the all inclusive nature of the employees' obligations and the special nature of the RLA's provisions. Plaintiffs also maintain that the "status quo" would be altered if the threatened activity took place, and that the RLA duty "to make and maintain" agreements would be violated. A strike or a concerted refusal to report to work or to cross picket lines would render nugatory the working conditions and rules relating to the collective bargaining agreements. Defendants' argument (that sympathy strikes or other concerted labor activity caused by sympathy with the IAM/Eastern Air Lines situation should not be considered a labor dispute) seems to disregard the realities of the situation.[5] A strike is a strike. Here, it is sympathetic activity designed to assist a fellow union in a labor dispute with an air carrier, Eastern Air Lines, which could shut down plaintiffs' public carrier operations. As defendants' witness Hanley stated, that activity would be designed to prevent any use of Lorenzo type tactics by plaintiffs against defendants in the future. As such it would have a labor purpose.

But beyond that a labor dispute in connection with the collective bargaining agreements exists. It is whether the defendant unions have a right to encourage a collective failure to report for work or whether the collective bargaining agreements constructively prevent such action. It is true that under the National Labor Relations Act (NLRA), a strike is enjoinable only when it is over a grievance required to be arbitrated pursuant to a provision in the collective bargaining agreement. *Boys Markets, Inc. v. Retail Clerks Union*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). It is also true that under the NLRA, participation in a sympathy strike, which is not subject to arbitration under the collective bargaining agreement, cannot be enjoined *Buffalo Forge Co. v. United Steelworkers of Am.*, 428 U.S. 397, 96 S.Ct.

---

**4.** In some cases, there are status quo agreements under 45 U.S.C. § 156 which would also be violated if the acts threatened took place. *Brotherhood of Railway Trainmen v. Jacksonville Terminal Co.*, 394 U.S. at 378, 89 S.Ct. at 1115; *American Airlines v. Air Line Pilots Ass'n*, 169 F.Supp. 777, 787–88 (S.D.N.Y.1958); *Long Island R.R. v. Brotherhood of R.R. Trainmen*, 185 F.Supp. 356, 358 (E.D.N.Y.1960). As stated in *Detroit & Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969), 45 U.S.C. § 152 contains an "implicit status quo requirement," which is "central to its design." 396 U.S. at 150, 151, 90 S.Ct. at 299, 300.

**5.** Defendants apparently have abandoned their position that any sympathetic action would relate not to a labor dispute but only to a political question. *Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Ass'n*, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982).

3141, 49 L.Ed.2d 1022 (1976). But, this is not an NLRA case. Under the RLA, prior to the exhaustion of the process, disputes are either "minor" and arbitrable under 45 U.S.C. § 153 or "major disputes" which include disputes over "changes in rates of pay, rules or working conditions" subject to mediation under 45 U.S.C. § 155 First (a) or "any other dispute" also subject to mediation under 45 U.S.C. § 155 First (b). "[F]rom the point of view of industrial relations our railroads are largely a thing apart.... The railroad world is like a state within a state." *Elgin J. & E. R.R. v. Burley*, 325 U.S. 711, 751, 65 S.Ct. 1282, 1303, 89 L.Ed. 1886 (1945) (Frankfurter, J., dissenting). This is an RLA case where the duty to arbitrate minor disputes, 45 U.S.C. § 153, and mediate "changes in rates of pay rules and working conditions," 45 U.S.C. § 155 First (a), and "all other disputes," 45 U.S.C. § 155 First (b), arises by virtue of statute as opposed to being governed solely by the terms of the collective bargaining agreement. The statute, 45 U.S.C. § 152 First, makes it a "duty" of "carriers ... and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay rules and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise...." This RLA "duty" of the carrier and the union acting on behalf of employees is greater than the NLRA contractual obligation enunciated in *Buffalo Forge, supra*. The duty exists "to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152 First. The words "any dispute" are not limited to any agreement between the carrier and employees but to any dispute between the carrier and its employees, whether contained in an agreement or not. Here, the parties dispute that there is a right of the employees to engage in a sympathy strike, slow down, refusal to cross picket lines, etc. Clearly such a strike or a slow down or other such concerted labor activity would interrupt "commerce" and plaintiffs' "operation." Thus, the primary object of Congress in

enacting the RLA as set forth in 45 U.S.C. § 151a will be clearly frustrated if no injunctive action is taken.

There is precedent for sympathy strikes against carriers subject to the RLA to be enjoined. *Trans Int'l Airlines v. International Bhd. of Teamsters*, 650 F.2d 949 (9th Cir.1980), *cert. denied*, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981); *Northwest Airlines, Inc. v. Int'l Assoc. Ma. & A.W.*, 323 F.Supp. 107 (D.Minn. 1970), *aff'd*, 442 F.2d 251 (8th Cir.) (per curiam), *cert. denied*, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971); *Trans World Airlines v. IAM*, 629 F.Supp. 1554, 1557 (W.D.Mo.1986). There is also authority that sympathy strikes are neither minor nor major disputes under the RLA, *Eastern Air Lines v. Flight Eng'rs Int'l Ass'n*, 340 F.2d 104 (5th Cir.1965). However, that court appears to have utilized the *Elgin* case, paraphrasing the definitions of "minor" and "major" disputes without resorting to the statutory language of 45 U.S.C. §§ 153 and 155 First (a) and (b).

Defendants argue also that absent defendants' right to honor the IAM picket lines by concerted action, the right of the IAM to picket has a reduced economic effect. Such a result, they say, was obviously not intended by *Burlington Northern*. This Court does not find the intent of the Supreme Court in that case obvious as it applies to the legality of concerted action by the employees who are the object of secondary picketing. Indeed, defendants' reading of *Jacksonville Terminal* and *Burlington Northern* as requiring the full application of the Norris La Guardia Act to RLA carriers when the arbitration and mediation process has not been exhausted, seems strained.

The defendants further contend that the right to engage in sympathy strikes or right to honor picket lines was always permitted in the past as inherent in the working relationship between Metro–North, LIRR and NJT and the respective defendants. If so, the factual dispute over that issue of the working relationship under the collective bargaining agreements should be arbitrated under the minor dispute mecha-

nism of the RLA if the defendants decide it relates to the attendance requirements of the plaintiffs or mediated under 45 U.S.C. § 155 First (a) or (b) if the defendants decide the right has a broader scope.

Lastly the defendants contend that the underlying dispute here is not over a right to honor picket lines set up by a union which has a dispute with an employer in another industry, but a dispute between the IAM and Eastern Air Lines in the person of Frank Lorenzo. They contend there is neither a dispute as to "pay, rules or working conditions" under § 152 First of the RLA nor a dispute over the formation of the collective agreement or efforts to secure them and that, accordingly, there is no dispute cognizable under the RLA. *See Eastern Air Lines v. Flight Eng'rs, supra.* Thus, they argue the Court is without jurisdiction due to the prohibitions of the Norris LaGuardia Act. The argument is also unpersuasive. It is based on the *Elgin* case's paraphrasing of the statute and not the statute itself. It also overlooks the overriding purpose of the RLA to prevent strikes and the dispute over the obligation to perform services under the collective bargaining agreements.

Accordingly, the Court finds that the plaintiffs' have shown a substantial likelihood of success on the merits of their actions insofar as they seek to prevent the contemplated concerted labor activity by the defendant union members who are employed by plaintiffs.

The Court concludes that plaintiffs' other contention that the Eastern IAM employees should also be enjoined from engaging in secondary picketing of the plaintiffs' premises does not have a likelihood of success on the merits. Plaintiffs contention is based on the language in the *Burlington Northern* decision approving secondary picketing with respect to picketing within the railway industry by a union that has exhausted the RLA settlement process. Plaintiffs would have this Court prevent picketing which crosses industry lines. Although plaintiffs' reading of *Burlington Northern* is accurate, it overlooks the fact that the *Burlington Northern* opinion determined the scope of permitted secondary picketing by reference to § 13(a) of the Norris LaGuardia Act, 29 U.S.C. § 113(a), which states that "a case shall be held to involve or grow out of a labor dispute when the case involves persons who were engaged in the same industry, trade, craft, or occupation." Thus, the statute under interpretation by the Supreme Court in *Burlington Northern* is much broader in its scope than the plaintiffs suggest. Indeed, its language, "same ... trade, craft or occupation," would directly apply to the members of IAM to permit their threatened secondary picketing. Accordingly, this Court will not enjoin such activities by IAM.

### Irreparable Harm

The parties have stipulated that plaintiffs' operations will have to cease if the threatened picket lines of the IAM are honored. There is a substantial likelihood that those picket lines will be honored absent an injunction. It is clear that such a cessation will cause immediate and irreparable harm in the form of substantial economic injuries [6] and the loss of good will by plaintiffs, not compensable in monetary damages. In addition, the public, over 400,000 persons, will suffer immediate and irreparable injury, both in substantial inconvenience and in loss of pay by those unable to get to work, with potential, but foreseeable, consequences, particularly for persons with modest income, of loss of jobs, rented housing, or items purchased on credit. The harm to defendants caused by the issuance of an injunction is far less. They will be denied their opportunity to express union solidarity by honoring another union's picket line and to assist another union in its lawful economic self-help activities, but they will be free to assist the IAM in other ways. The defendants also assert that an injunction along the lines of the temporary restraining order will limit their ability to prevent future union busting tactics by persons emulating Frank Lorenzo of Eastern Air Lines, and will deprive them of a means of seeking the intervention by the Presi-

6. *E.g.,* Metro–North states its losses will be $1 million per day.

dent or through legislation in Congress. Again, they may seek relief in other ways. Although a preliminary injunction will impinge on defendants' rights, it also prevents plaintiffs and the public from being made victims for that purpose. The harm imposed on defendants is far less than the immediate and irreparable damage which the plaintiffs and public will suffer if the injunction is not issued. Furthermore, in view of the testimony that, in some defendant unions, members have always observed picket lines without the need for instructions or encouragement, the injunction will require the defendants to instruct their members to report for work. The Court finds (1) a substantial likelihood that each plaintiff will succeed on the merits, and (2) a clear risk of immediate and irreparable injury to plaintiffs and the public. Even placing in balance the hardships to defendants, the harm to plaintiffs clearly outweigh any harm to defendants. Accordingly, a temporary injunction will issue restraining defendants from engaging in sympathy strikes, slowdowns, or other concerted labor activity, in connection with any picketing of plaintiffs by IAM's Eastern Air Lines members during the pendency of the Eastern Air Line/IAM strike.

The parties will settle an order on notice in three days. Until then the temporary restraining orders shall remain in effect.

SO ORDERED.