NATIONAL RAILROAD PASSENGER
CORPORATION, Plaintiff,

v.

TRANSPORT WORKERS UNION
OF AMERICA, AFL–CIO;  et
al., Defendants.

No. CIV.A. 03–2010 JR.

United States District Court,
District of Columbia.

Dec. 10, 2003.

Thomas Edward Reinert, Jr., Morgan, Lewis & Bockius, LLP, Washington, DC, for Plaintiff.

Richard Edelman, O'Donnell, Schwartz, and Anderson, Washington, DC, for Defendants.

## *MEMORANDUM ORDER DENYING PRELIMINARY INJUNCTION*

ROBERTSON, District Judge.

Plaintiff National Railroad Corp. (Amtrak) moves for injunctive relief under the Railway Labor Act, 45 U.S.C. § 151, *et seq.*, to restrain the Transport Workers Union of America, AFL–CIO, (TWU), the Brotherhood of Maintenance of Way Employees (BMWE), the Service Employees International Union's National Council of Firemen and Oilers (SEIU–IBOFO), and the Hotel Employees and Restaurant Employees International Union (HERE) from staging a one-day work stoppage.[1] The unions characterize this work stoppage as a political protest against the failure of the Bush Administration and Congress to provide adequate funding for Amtrak; Amtrak calls it an unlawful strike.

The matter was first presented to this Court on September 29, 2003, as a motion for a temporary restraining order, the unions having announced at a rally on September 17, that October 3 would be the date of the work stoppage. The parties agreed that the work stoppage could be postponed in order to permit a more deliberate consideration of the issues presented, however, and the preliminary injunction motion that is now before me for decision was set for hearing on November 14, 2003.

On November 13, 2003, the day before Amtrak's motion was set for hearing, the FY 2004 federal subsidy for Amtrak was resolved by a House/Senate Conference Committee, which settled on $1.22 billion, 149 Cong. Rec. H12,323–12,746 (daily ed. Nov. 25, 2003), some $600 million less than the $1.8 billion Amtrak had stated publicly was its bare bones minimum. Indeed, in early September 2003, after the Senate had approved a $1.3 billion subsidy and the House a $900 million subsidy, Amtrak issued an "Employee Advisory" describing any number short of $1.8 billion as a threat to the continued safe operation of large parts of the system at the very least, and, possibly, as a threat to the continued existence of Amtrak itself. *See* Moneypenney Decl., Ex. 3. It was after the issuance of that Amtrak "Employee Advisory" that the TWU announced that it would hold a rally on September 17, 2003, and that its workers, along with the members of four other unions, would not work on October 3, 2003.

Edward Walker testified at the preliminary injunction hearing that the planned one-day work stoppage (or strike: the words will be used interchangeably in this memorandum, notwithstanding the great weight each side attaches to its own choice of words) would irreparably injure Amtrak. That point is not disputed, and so it is unnecessary to dwell upon the nuances of Mr. Walker's testimony to the effect that a one-day work stoppage now, during the holiday season, would be even more devastating than it would have been on October 3, 2003, as originally planned;

---

1. A fifth union, the International Brotherhood of Electrical Workers (IBEW), was originally named as a defendant, but was dismissed pursuant to a stipulation prior to the hearing on the preliminary injunction motion.

that the work done by the defendant unions includes safety critical functions, the withholding of which would render Amtrak unsafe; and that employees not affiliated with the striking unions would be essentially inhibited by picket lines, so that the strike could not be limited in its effect to the unions sponsoring the work stoppage. Similarly, there is no genuine dispute that the unions are aggrieved by what they perceive to be Congressional under-funding of Amtrak, and so the testimony of Charles Moneypenney of TWU and Donald Griffin of the BMWE about the unions' concerns for safety on the railroad will not be gainsaid or second-guessed.

There is a dispute however—and it is the central dispute that must be resolved on this motion for preliminary injunction—about whether the unions' grievance with Congress and the President is the real reason for the planned work stoppage, and about whether or not the Railway Labor Act (RLA) applies in the situation presented by this case. If the RLA does apply, an injunction should issue against the work stoppage, because such a stoppage would violate the status quo.[2] *Consol. Rail Corp. v. Ry. Labor Executives' Ass'n*, 491 U.S. 299, 303, 109 S.Ct. 2477, 105 L.Ed.2d 250 (1989). If it does not apply, the procedural and substantive requirements of the Norris–LaGuardia Act (NLGA) would make the issuance of an injunction in this situation virtually impossible, 29 U.S.C. § 101.

The RLA makes it the "duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." 45 U.S.C. § 152. The unions' position is that the RLA is inapplicable because the dispute giving rise to the work stoppage is not "between the carrier and the employees thereof," but between the unions and two branches of the government. Amtrak responded to that assertion with a raised eyebrow even back in September, when Congress had yet to act on the 2004 Amtrak subsidy. Now, Amtrak responds that, whatever the original merits of the union's argument, it stands refuted, if not mooted, by the Conference Committee report, which has effectively put an end to the 2004 budget subsidy dispute. In any case, Amtrak argues, the unions' claim of a political motive is pretextual, and the planned work stoppage is really union muscle-flexing designed to gain a strategic advantage in ongoing negotiations over new collective bargaining agreements.

The factual picture that emerged from the evidentiary hearing held on this motion makes it hard to determine which side has the better of the argument about the unions' real purpose, and it is indeed possible that a measure of the truth lies on both sides. Joseph Brest, Amtrak's vice-president for labor relations, described the relationship between Amtrak's Congressional appropriations and its collective bargaining. He pointed out that in 1997 the unions agreed to contingency clauses in their collective bargaining agreements, the effect of which was to release Amtrak from obligations to pay wage increases if Congressional appropriations did not satisfy the minimum set forth in the contingency clauses. *See* Ex. 3L. Although these contingencies have never been invoked, Mr.

---

**2.** If the RLA applies, doctrine requires further analysis to determine whether a "major dispute" or a "minor dispute" exists. *Elgin, J. &* E., *Ry. Co. v. Burley*, 325 U.S. 711, 723, 65 S.Ct. 1282, 89 L.Ed. 1886 (1945).

Brest's testimony suggested that a work stoppage intended to encourage Congress to increase Amtrak's subsidy would also be intended, at least in part, to keep Amtrak from invoking its contingency clauses. Moreover, Mr. Brest testified that Amtrak is now in negotiation with the four remaining union defendants on the terms of the next collective bargaining agreements, and that no agreement has been reached with any of them. He also said that the IBEW, one of the five unions originally stating an intention to stop work on October 3, has reached agreement with Amtrak and will not strike.

Charles Moneypenney of the TWU testified that the purpose of the work stoppage would be to draw as much attention as possible to Amtrak's safety issues, before accidents happen. He said the determination to stop work came after the publication of the September 8 Employee Advisory by David Gunn, Amtrak's CEO. Mr. Gunn's Advisory stated that, if Amtrak's subsidy did not reach the $1.8 billion level, critical infrastructure and equipment repairs would be in jeopardy and "on any given day something could fail. . . ." *Id.* at 2. Responding to the suggestion that the November 13 Conference Committee decision had "mooted" the unions' stated purpose, Mr. Moneypenney asserted that the unions' purpose of informing the public was not moot at all. He stated that Amtrak will likely require a supplemental appropriation during FY 2004, as a consequence of the underfunding. In the meantime, members of his union and the public would be on Amtrak trains every day, subjected to increased safety risk. Mr. Moneypenney conceded on cross-examination that TWU is frustrated with the pace of negotiations over a new contract and concerned that Amtrak will readjust its budget and reduce labor costs following the Conference Committee's decision. He also conceded that a portion of the capital budget for Am-

trak might be used to repair wrecked passenger cars and that this would likely translate into more work for TWU members, but he continued to maintain that the purpose of the proposed work stoppage is to draw attention to safety issues.

Donald Griffin of the Brotherhood of Maintenance of Way Employees (BMWE) also denied that the proposed work stoppage was aimed at the collective bargaining process. He testified that the Conference Committee's decision would allocate approximately $750 million in operating funds to Amtrak and $450 million for capital improvements. The operating funds (which include labor costs) are on par with Mr. Gunn's appropriation request; the shortfall is in the amount allocated for capital improvements (infrastructure repairs to, for example, ties, bridges, and a portal bridge in Newark, New Jersey). Mr. Griffin also testified that there is no direct passthrough of Congressional appropriations to labor costs, so that, even if a work stoppage should succeed in persuading Congress to provide the full $1.8 billion, the union members' terms of employment likely would not be affected.

Amtrak argues that, even if the stated purpose of the work stoppage is accepted at face value, such a politically motivated strike nevertheless qualifies for coverage under the RLA because the employer-employee relationship is "the matrix of the controversy." This language comes, as does Amtrak's argument, from *Jacksonville Bulk Terminals v. International Longshoremen's Ass'n*, 457 U.S. 702, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982), in which the Supreme Court interpreted the term "labor dispute" as it is used in the NLGA and the National Labor Relations Act (NLRA). That case involved a work stoppage to protest the Soviet Union's intervention in Afghanistan. The Court held that the protest was a "labor dispute" under both the NLGA and the NLRA, not-

withstanding that it was not directed at the employer, because the "employer-employee relationship is the matrix of the controversy." *Id.* at 712, 102 S.Ct. 2672. In Amtrak's submission, any dispute that would be a "labor dispute" under the NLGA or NLRA is covered by RLA, and, under *Jacksonville Bulk Terminals,* the RLA is properly invoked to restrain a "political" work stoppage whose "matrix" is the employer-employee relationship.

Amtrak's reliance on *Jacksonville Bulk Terminals* is misplaced. It is true that judicial interpretations of the RLA have been informed by cases interpreting the NLGA and the NLRA, see, e.g., *Pittsburgh & Lake Erie R. Co. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 509, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989), but none has said that the RLA's coverage of disputes "between the carrier and the employees" is as broad as the term "labor dispute" found in the NLGA and the NLRA. *Compare* 29 U.S.C. § 113(c), and 29 U.S.C. § 152(9), *with* 45 U.S.C. § 152 First. Moreover, Congress deliberately gave broad meaning to the term "labor dispute" in the NLGA: "Congress attempted to write its bill in unmistakable language because it believed previous measures looking toward the same policy against nonjudicial intervention in labor disputes had been given unduly limited constructions by the Courts." *Burlington N.R. Co. v. Bhd. of Maint. of Way Employees,* 481 U.S. 429, 441, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987) (internal quotation marks and citation omitted).

■■■ One central purpose of the RLA is of course to prevent strikes and resulting interruptions to commerce, but the Act does not impose an absolute bar against strikes. Instead, it establishes procedures for channeling disputes into a dispute resolution process. *See Burlington N.R. Co.,* 481 U.S. at 444–45, 107 S.Ct. 1841; *Detroit & T.S.L.R. Co. v. United Trans. Union,*

396 U.S. 142, 152, 90 S.Ct. 294, 24 L.Ed.2d 325 (1969). In the context of major disputes, it delays strikes until the dispute resolution process has been exhausted, *Burlington Northern,* 481 U.S. at 445, 107 S.Ct. 1841, while in minor disputes, parties are channeled into arbitration, *Brotherhood of R.R. Trainmen v. Chicago R. & I.R. Co.,* 353 U.S. 30, 36–37, 39, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). In this case, Amtrak has made no effective rejoinder to the unions' argument that their dispute with Congress and with the administration over Amtrak funding *cannot be resolved by negotiation, mediation, or arbitration with Amtrak.* A dispute that cannot be resolved through the dispute resolution processes established by the RLA does not trigger the RLA.

Two cases upon which Amtrak relies, *Delta Air Lines, Inc. v. Air Line Pilots Ass'n,* 238 F.3d 1300 (11th Cir.2001), and *United Air Lines, Inc. v. International Ass'n. of Machinist and Aerospace Workers,* 243 F.3d 349 (7th Cir.2001), counsel careful scrutiny of stated motivations for walkouts or work stoppage. Both, however, are distinguishable on their facts. In *Delta Air Lines,* the Eleventh Circuit applied the RLA to enjoin pilots from refusing to work voluntary overtime, even though the union claimed that the refusal was a personal choice of the pilots, actively discouraged by the union itself. 238 F.3d at 1309. In *United Air Lines,* the Seventh Circuit applied the RLA to enjoin a slowdown by mechanics, allegedly in response to the termination of certain employees, even though the union did not encourage the slowdown. 243 F.3d at 354. The underlying disputes in both the *Delta Air Lines* case and the *United Air Lines* case, unlike the dispute in this case, were unarguably "between the carrier and the employees thereof."

Another case on which Amtrak places considerable weight is *Long Island R. Co.*

*v. International Ass'n of Machinists & Aerospace Workers,* 709 F.Supp. 376 (S.D.N.Y.1989), *aff'd* 874 F.2d 901 (2d Cir. 1989). In that case, the district court restrained a strike by Amtrak employees who desired to honor the picket lines of a sister union that was lawfully engaging in self-help. The court's rationale—that a "minor dispute" had arisen between Amtrak and its employees about whether the employees' decision to honor another unions' picket line would violate the duty the RLA imposed on them to avoid interruptions to commerce or the operation of the carrier—is a paragon of bootstrap logic, and I respectfully decline to follow it.[3]

I turn finally to Amtrak's argument that the unions' stated rationale for their planned work stoppage is pretextual, and that in fact the motivation for the planned one-day strike is the unions' desire to fire a shot across Amtrak's bow and demonstrate union solidarity in the context of ongoing wage and hour negotiations. In support of this argument, Amtrak points to a letter sent on July 8, 2003 by the president of the BMWE to the Mediation Board, requesting release from mediation and a proffer of arbitration. *See* Ex. 3A. Amtrak's Mr. Brest testified that, in his belief, release from mediation would allow the unions to move forward with the process mandated by the RLA, leading to a presidential emergency board and, eventually, either an agreement or lawful self-help in the form of a strike or a lockout. Amtrak calls this letter "smoking gun" evidence for the proposition that the real reason for the proposed work stoppage is to influence the bargaining process. The BMWE's Mr. Griffin, however, characterized the letter as simply a statement of union frustration with the pace of collective bargaining, and with Amtrak's intransigence and bad faith.[4]

---

**3.** Amtrak raises additional arguments, I believe in an attempt both to convince me that this dispute should at least be classified as "minor" under the RLA and to impress upon me the consequences of a ruling that declines to enjoin this work stoppage. First, Amtrak emphasizes that it has the authority to discipline and even terminate employees for engaging in this "political protest" even in the absence of an express "no strike clause." *Cf. McCarthy v. Nat'l R.R. Passenger Corp.,* 712 F.Supp. 5 (D.Mass.1989), *aff'd* 915 F.2d 43 (1st Cir.1990) (declining to enjoin Amtrak from disciplining leaders of a strike, finding the dispute over discipline to be minor for purposes of the RLA). Amtrak notes that one of the reasons courts enjoin strikes under the RLA is to prevent disciplinary reactions because they destabilize labor relations, see, e.g., *National Airlines, Inc., v. International Ass'n of Machinists,* 416 F.2d 998, 1007 (5th Cir.1969) (finding airline's mass discharge of striking workers to be impermissible self help), and argues that injunctive relief in response to this protest is consistent with the RLA's purpose of avoiding interruptions to commerce. Second, Amtrak suggests that the unions may face state law tort liability for this "protest" if the RLA does not apply, whereas the RLA would normally preempt state tort liability. *See Kaufman v. Allied Pilots Ass'n,* 274 F.3d 197 (5th Cir.2001)(applying federal labor law preemption principles under *San Diego Bldg. Trades Council v. Garmon,* 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959)). Amtrak suggests that this unintended result underscores why the RLA should be interpreted as a "comprehensive system." These arguments may provide a rationale for enjoining strikes in disputes otherwise covered by the RLA, but it does not help answer the question of whether this dispute—whether major or minor—falls under the RLA in the first place. The prospects of discipline and tort liability are for the union and their members to weigh, but they do not affect my decision.

**4.** Amtrak points to two other documents in support of their pretext argument. The first is an internet page posted by BMWE Lodge 3014 providing "Amtrak Strike News." Ex. 16. The second is a letter from the General Chairman of the Pennsylvania Federation of the BMWE to the member of its "Amtrak Committees" the stated purpose of which is to "update [recipients] on the planned strike to protest the inability of the politicians to prop-

During oral argument of this motion, I invited counsel to identify which side had the burden of persuasion as to the real purpose of the unions' planned work stoppage. Neither side responded with further briefing. One plausible approach, borrowed from the Supreme Court's famous burden shifting analysis in the employment discrimination context, see *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), was "floated" at oral argument and not rejected: In order to establish a *prima facie* case giving rise to an injunction under the RLA, the carrier must make some showing that there is an ongoing dispute between it and its employees and that the union has threatened an action that would interrupt commerce or the operation of the carrier. Here, Amtrak has shown that its collective bargaining agreements with the unions are in negotiation, even if not active negotiation, and that the unions have threatened a one-day strike. Such a showing shifts the burden to the unions to assert a legitimate reason for the work stoppage that is unrelated to whatever dispute it may have with the carrier. The testimony of Messrs. Moneypenney and Griffin was that the purpose of the planned work stoppage is to focus the attention of Congress, the White House, and the public on the importance of Amtrak and its safety problems. Such a showing of a legitimate basis for the stoppage that is unrelated to any wage and hour dispute with the carrier shifts the burden back to the carrier to establish by a preponderance of the evidence that the unions' asserted reason or reasons for the work stoppage are pretextual.

It is that last piece of the burden that Amtrak has failed to sustain. To be sure,

the unions' "legitimate unrelated basis" case is significantly weaker today than it was at the end of September, when the issue of FY 2004 funding was still undecided, but their stated purpose of bringing the attention of Congress and the public to the ongoing plight of Amtrak is still more than plausible, and it has not been shown to be pretextual.

If the RLA were construed to require the issuance of an injunction to restrain *any* work stoppage during a time when negotiation between carrier and union over wage and hours is open or ongoing—to use the words of Amtrak counsel at oral argument, if the union cannot resort to self-help with respect to any dispute with anybody for any reason "until the waltz is over"—then Amtrak would be entitled to an injunction as a matter of law, regardless of the unions' purpose. Because I do not read the RLA or the cases decided under it to impose such an absolute anti-strike regime, however, I find that the RLA does not apply in this case.

■ I do find, however, that for purposes of the NLGA this dispute must be classified as "labor dispute." *See Jacksonville Bulk Terminals*, 457 U.S. at 710–711, 102 S.Ct. 2672; *Burlington N.R. Co.*, 481 U.S. at 441, 107 S.Ct. 1841. The procedural and substantive requirements of Section 7 of the NLGA must be satisfied before I can enjoin a strike under the NLGA. One of those requirements is that an "unlawful act" has been threatened by the union. 29 U.S.C. § 107(a). Because I find that the RLA does not apply in this case, the unions' planned work stoppage would not be an unlawful act. It is accordingly

erly fund Amtrak." Ex. 17. BMWE's Griffith admitted that the union leadership had some difficulties communicating with their members about the nuances of terminology, but I

do not that regard these as "smoking guns," as Amtrak does: there is no magic in the choice of a word in such pieces of correspondence.

**ORDERED** that Amtrak's motion for a preliminary injunction [4] is **denied.**