**NORTHWEST AIRLINES, INC., Plaintiff,**

v.

**INTERNATIONAL ASSOCIATION OF MACHINISTS AND AEROSPACE WORKERS, AFL–CIO ("IAM"), IAM District Lodge 143 ("District 143"), and Guy Cook, President and General Chairman of District 143, Defendants.**

Civ. No. 3–89–108.

United States District Court, D. Minnesota, Third Division.

March 17, 1989.

Robert L. Hobbins, Mark B. Rotenberg, Dorsey & Whitney, Minneapolis, Minn., for plaintiff.

John A. Edmond, Guerrieri, Edmond & James, Washington, D.C., and Michael W. Unger, Hvass, Weismann & King, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

MAGNUSON, District Judge.

This matter is before the court upon an order to show cause why a preliminary injunction should not issue following this court's grant of a temporary restraining order on March 2, 1989. For the reasons set forth below the court finds that a preliminary injunction is proper.

*Factual Background*

Plaintiff Northwest Airlines, Inc. (Northwest) is a "carrier" within the meaning of the Railway Labor Act (RLA), 45 U.S.C. § 181, and is therefore subject to the provisions of the RLA. Northwest furnishes scheduled air transportation to over 118 cities and 17 foreign countries with hundreds of scheduled departures per day. Northwest carries substantial quantities of air freight and mail in addition to passengers.

Defendant International Association of Machinists and Aerospace Workers, AFL–CIO (IAM), is the certified bargaining representative for approximately 21,000 Northwest employees. The IAM serves as collective bargaining "representative" for these employees, as defined in the RLA, and is also subject to the RLA's provisions. Defendant IAM District Lodge 143 (District 143) is an unincorporated association and an administrative agency of the IAM and is responsible within the IAM for Northwest's employees. District 143 conducts the negotiation and administration of Northwest–IAM labor agreements and presents matters to the System Board of Adjustment on behalf of the IAM. Defendant Guy Cook is the President/General Chairman of District 143. Cook possesses substantial responsibility for contract negotiation and administration and resolution of grievances.

Northwest and the IAM are parties to four collective bargaining agreements covering Northwest's IAM-represented employees. The "Blue Book" covers mechanics and ramp employees; the "Green Book" covers clerical, office, fleet and passenger service employees; the "Gold Book" covers flight kitchen personnel; and the "Yellow Book" covers plant protection employees. Each of these agreements contains a no-strike clause similar to Article 25, Paragraph N of the Green book:

It is understood and agreed that the Company will not lock out any employees and the Union will not sanction nor will the employees take part in any strike, slowdown or picketing of Company premises until the procedures for settling disputes as provided herein and as provided by the Railway Labor Act, as amended, have been exhausted.

On February 27, 1989, the IAM filed a complaint in the United States District Court for the District of Columbia against the Airlines Industrial Relations Conference, Inc., Piedmont Airlines, Inc., Trans World Airlines, Inc., United Airlines, Inc., US Air, Inc., and Northwest (No. 89–0514–JHP) (the D.C. Action). The IAM sought a declaration that (1) IAM members employed by Eastern Airlines have a right to engage in secondary picketing of the named carriers and (2) IAM members employed by the named carriers have the right to honor secondary picket lines. In its complaint the IAM stated that "in the event that the IAM and Eastern are unable to reach an agreement by the end of the cooling off period ... the IAM will fully exercise its right to engage in self-help, including, but not limited to secondary activity against defendants Northwest, US Air, TWA, United and Piedmont." On March 4, 1989, the IAM commenced a strike against Eastern.

Defendant Cook has told Northwest that he believes that District 143 members have the right to engage in secondary activity against Northwest and to honor any IAM pickets at Northwest. Cook has also informed Northwest that he believes that the IAM is not bound by the no-strike clauses.

Northwest has submitted the following issue to the appropriate System Board of Adjustment for arbitration:

Whether the employees represented by the IAM, the IAM and its officer and agents have threatened, encouraged, authorized or taken part in, or threatened to take part in and refused to discourage, a strike or picketing or concerted refusal to work for the company contrary to the provisions of the aforementioned Blue Book, and, if so, what is the appropriate remedy.

Northwest has submitted identical issues with respect to the no-strike clauses of the Green, Yellow, and Gold books.

On March 1, 1989, Northwest filed the instant action requesting that defendants be enjoined from encouraging or directing Northwest's IAM-represented employees to honor any picket lines established by Eastern Air Lines employees. The court issued a temporary restraining order having this effect on March 2, 1989. Upon agreement of the parties the court extended the temporary restraining order until March 15, at which time the parties presented evidence, testimony and argument on whether a preliminary injunction should issue.

*Analysis*

I. Compulsory Counterclaim

Before turning to the merits of the case the court must address defendants' contention that this court lacks jurisdiction over Northwest's action because it is a compulsory counterclaim in the D.C. action. Under Fed.R.Civ.P. 13(a) a claim is a compulsory counterclaim "if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction."

Each of the defendants is a proper party to this action. However, only the IAM is a named party in the D.C. Action. The question becomes, therefore, whether the D.C. court may assert personal jurisdiction over District 143 and Guy Cook. The District of Columbia long-arm statute sets out a number of activities that may provide a basis

for personal jurisdiction in the District of Columbia. *See* D.C.Code § 13–423 (1981). The only arguable basis for personal jurisdiction over District 143 and Cook in this case is that they were "transacting ... business in the District of Columbia." D.C. Code § 13–423(a)(1).

In order for a nonresident defendant to satisfy the "transacting business" requirement it must engage in "some affirmative act by which the defendant brings itself within the jurisdiction and establishes minimum contacts." *Cohane v. Arpeja–California, Inc.*, 385 A.2d 153, 158 (D.C.1978), *cert. denied*, 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978). The defendants have not produced sufficient evidence to show that District 143 and Cook have transacted business in the District of Columbia. Although a few District 143 members work at a ticket office in D.C., District 143 does not have an office there. None of the District 143 General Chairmen are domiciled in D.C., and the defendants have not shown that District 143 conducts any union business there. Moreover, D.C.Code § 13–423(b) requires that the acts establishing the contracts with the District must be related to the litigation: "When jurisdiction over a person is based solely upon this section, only a claim for relief arising from acts enumerated in this section may be asserted against him."

Northwest's claims against Cook and District 143 do not arise from any particular transaction of business by them in the District of Columbia. The claims involve the contractual no-strike clause contained in agreements negotiated with the IAM in Minneapolis, and the minor dispute over the IAM's threatened breach of this clause, which has been submitted to a System Board of Adjustment to be convened in Minneapolis. In sum, Northwest's claims are unrelated to any activity covered by the D.C. long-arm statute.

In a last ditch effort to turn Northwest's action into a compulsory counterclaim Guy Cook testified that he would waive any objections to personal jurisdiction in D.C. on behalf of himself and District 143. Cook's "waiver" is irrelevant to the issue of Rule 13(a) personal jurisdiction. Any other conclusion would render the jurisdiction requirement meaningless because a defendant could waive objections in one jurisdiction for the purpose of avoiding adjudication in the plaintiff's forum. Rule 13(a) was not intended to encourage this kind of forum shopping. Therefore the court will retain jurisdiction over Northwest's action.

## II. Propriety of an Injunction

 The question of whether Northwest's IAM-represented employees may honor Eastern employees' secondary picket lines without violating the no-strike clauses in the collective bargaining agreement is a "minor" dispute under the RLA. "In essence, a major dispute involves the formation or alteration of a collective bargaining agreement ... while a minor dispute merely involves differing interpretations of such an agreement." *Alton & Southern Lodge No. 306 v. Alton & Southern Ry. Co.*, 849 F.2d 1111, 1113 (8th Cir.1988). The RLA establishes procedures for the mandatory arbitration of minor disputes. Once one party has petitioned the Adjustment Board to resolve the dispute the Adjustment Board formulates a decision that is final and binding on both sides. 45 U.S.C. § 153, subd. 1(i) and (m).

Originally defendants did not object to Northwest's characterization of the contract dispute as "minor." At the preliminary injunction hearing the defendants changed their position. Now they claim that the IAM has no dispute with Northwest. The facts of the case contradict this argument; the parties clearly have differing interpretations of the collective bargaining agreement.[1] Pending arbitration of this dispute Northwest seeks an injunction to maintain the status quo. Defendants, on the other hand, contend that the Norris–LaGuardia Act prohibits such injunctions.

---

1. Defendants appear to be arguing that even if they may not strike over a minor dispute with Northwest, they may strike if they have no dispute at all with Northwest. This argument defies logic and contradicts the purposes of the RLA discussed *infra*.

Northwest is not requesting an injunction of secondary picketing activity by Eastern Airlines employees. Such an injunction is barred by *Burlington Northern Ry. Co. v. B.M.W.E.*, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987). There the Supreme Court upheld a union's right to engage in secondary activity, stating that "parties who have unsuccessfully exhausted the Railway Labor Act's procedures for resolution of a major dispute ... [may] employ the full range of whatever peaceful economic power they can muster, so long as its use conflicts with no other obligation imposed by federal law." *Id.* 107 S.Ct. at 1852 (quoting *Trainmen v. Jacksonville Terminal Co.*, 394 U.S. 369, 392, 89 S.Ct. 1109, 1123, 22 L.Ed.2d 344 (1969)).

Defendants cite *Burlington Northern* as the controlling authority for the case at hand. They argue that *Burlington Northern* not only protects secondary activity but that it implies a right to honor secondary picket lines as well. The court declines to decide this issue because even if Northwest employees have a right to honor Eastern's picket lines, they may waive that right. This is precisely the issue that the System Board of Adjustment must arbitrate. Did the union waive its right to honor secondary picket lines when it agreed to the no-strike clauses?

It would be inappropriate for the court to rule on the merits of the contract dispute and thereby influence the decision of the System Board. However, the court must consider Northwest's request for a status quo injunction pending the arbitration decision. As the *Burlington Northern* court recognized, the Norris–LaGuardia Act expresses a basic policy that injunctions of labor union activities are disfavored. *Burlington Northern*, 107 S.Ct. at 1846. Section 1 of the Act states, "No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter." 29 U.S.C. § 101. This policy applies specifically to injunctions against "[c]easing or refusing to perform any work

or to remain in any relation of employment." 29 U.S.C. § 104.

On its face this provision appears to prohibit the relief requested by Northwest, but courts have consistently recognized narrow exceptions. Indeed the *Burlington Northern* opinion states that "[t]o accommodate the competing demands of the RLA and the Norris–LaGuardia Act, our cases establish that the Norris–LaGuardia Act 'does not deprive the federal court of jurisdiction to enjoin compliance with the various mandates of the Railway Labor Act.'" 107 S.Ct. at 1851 (citations omitted).

The classic example of such an exception occurred in *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957). In that case the union filed a number of grievances, and when mediation failed the company submitted the controversy, a minor dispute, to the Adjustment Board. Rather than arbitrate the dispute, as required by the RLA, the union responded by issuing a strike call. The company sought and ultimately received a preliminary injunction of the strike pending the outcome of the arbitration.

In upholding the injunction the Supreme Court relied upon the purposes of the RLA and the Norris–LaGuardia Act and their relation to each other. From the beginning the declared purpose of the RLA was "to settle all disputes, whether arising out of the application of ... agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof." *Id.* at 36, 77 S.Ct. at 638 (quoting original RLA, 44 Stat. 577–78 (1926)). Congress strengthened the RLA in 1934 by making its arbitration procedures mandatory, thus providing detailed procedures for the orderly settlement of minor disputes. *See Burlington Northern*, 107 S.Ct. at 1854 ("the primary goal of the RLA is to settle strikes and avoid interruptions to commerce.").

Congress designed the RLA specifically for the railroad industry, the lifeblood of commerce at the time, and subsequently

extended it to the airlines. "In adopting the Railway Labor Act, Congress endeavored to bring about stable relationships between labor and management in this most important national industry." *Chicago River*, 353 U.S. at 40, 77 S.Ct. at 640. In contrast, the Norris–LaGuardia Act is a more general statute. It "was designed primarily to protect working men in the exercise of organized economic power...." *Id.* Congress enacted Norris–LaGuardia in order to correct abuses of the injunctive remedy in labor disputes. The *Chicago River* court was sensitive to this concern and recognized that widespread use of injunctions could "upset[ ] the natural interplay of the competing economic forces of labor and capital." *Id.* Nevertheless, the Court held that an injunction in combination with the RLA arbitration procedures does not "strip[ ] labor of its primary weapon without substituting any reasonable alternative." *Id.* at 41, 77 S.Ct. at 640.

The importance of this distinction between the RLA and the Norris–LaGuardia Act becomes clear in light of the Supreme Court's decision in *Buffalo Forge v. United Steelworkers*, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976). In *Buffalo Forge* the employer brought an action under § 301(a) of the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a), to compel arbitration to decide whether a no-strike clause in the collective bargaining agreement barred a sympathy strike. The employer also sought an injunction of the sympathy strike pending arbitration. The lower courts refused to issue an injunction, and the Supreme Court affirmed. The Court pointed out that

> [i]f an injunction could issue against the strike in this case, so in proper circumstances could a court enjoin any other alleged breach of contract pending the exhaustion of the applicable grievance and arbitration provisions even though the injunction would otherwise violate one of the express provisions of [the Norris–LaGuardia Act].

*Id.* at 410, 96 S.Ct. at 3149. *See also Jacksonville Bulk Terminals, Inc. v. International Longshoremen's Assoc.*, 457 U.S. 702, 721–23, 102 S.Ct. 2672, 2684–86,

73 L.Ed.2d 327 (1982) (reaffirming *Buffalo Forge* ).

*Buffalo Forge* involved a no-strike clause similar to the ones at issue here, and defendants argue that *Buffalo Forge* compels this court to refuse an injunction. *Buffalo Forge* is not controlling, however, because the important policy considerations underlying the RLA were not at stake in *Buffalo Forge*. The union did not and could not threaten to shut down a vital artery in the nation's transportation network and severely disrupt the flow of commerce.

The Court of Appeals for the Ninth Circuit was confronted with the potential for such a crippling strike in *Trans International Airlines, Inc. v. International Brotherhood of Teamsters*, 650 F.2d 949 (9th Cir.1980) *cert. denied, ALPA v. Trans International Airlines, Inc.*, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981). The flight attendants of Trans International Airlines (TIA) went on strike after exhausting the dispute mechanisms of the RLA. TIA's flight engineers and pilots honored the flight attendants' primary strike and refused to cross the picket line. The engineers and pilots engaged in this sympathy strike despite no-strike clauses in their collective bargaining agreements and without exhausting RLA arbitration procedures.

Writing for the court Judge (now Justice) Kennedy ruled that "the district court had jurisdiction to enjoin the sympathy strike in its entirety." *Id.* at 964. He distinguished *Buffalo Forge* as a case governed by the Norris–LaGuardia Act. "A principal goal of the Court in *Buffalo Forge* was to avoid judicial intrusion on an arbitration form established by contract." *Id.* at 965. The presence of RLA dispute resolution procedures mitigated this fear of judicial intrusion in *Trans International Airlines.* In the court's view "[t]he minor dispute arbitration procedure was designed as a substitute for prearbitration strikes ... and ... this includes sympathy strikes...." *Id.* at 966.

Defendants suggest that *Burlington Northern* has eroded the precedential val-

ue of *Trans International Airlines.* They contend that after *Burlington Northern* no court has jurisdiction to issue a status quo injunction pending arbitration of a minor dispute, and they cite *IAM v. Eastern Air Lines, Inc.,* 826 F.2d 1141 (1st Cir. 1987), as authority. The Court of Appeals for the First Circuit in that case held that pending arbitration of a minor dispute the district court lacked jurisdiction to issue a status quo injunction. The court decided *IAM v. Eastern* in the context of a dispute over the layoff of 68 employees. The union filed grievances and sought arbitration but did not threaten a strike. Instead the union requested that the employees be reinstated pending the arbitration. There was no danger of interruption to the transportation system or the flow of commerce, and an injunction to prevent violation of specific mandates of the RLA was therefore unnecessary.

The court in *IAM v. Eastern* stated that "[i]f the Union wins the grievance before the systems board, the board has the full authority to make all of the affected employees whole." 826 F.2d at 1148 (citations omitted). For Northwest this not the case. A sympathy strike would inflict irreparable harm on Northwest. As the court noted in *Trans International Airlines* "failure to grant injunctive relief would make the arbitrator's decision a meaningless one." 650 F.2d at 967.

Where a carrier satisfies the traditional standards for preliminary relief the RLA grants a federal court the authority to enjoin a strike pending arbitration of a minor dispute between the carrier and the union. If the interpretation of a no-strike clause is at issue, the union must first establish through arbitration its contractual right to engage in a sympathy strike before disrupting a carrier's operation. *Id.* at 966.

In the eighth circuit the case of *Dataphase Systems, Inc. v. C.L. Systems, Inc.,* 640 F.2d 109 (8th Cir.1981), sets out the four factors that must be evaluated prior to issuing a preliminary injunction: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that granting the injunction will in-

flict on other parties litigant; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Id.* at 113.

The *Dataphase* factors parallel the criteria listed in the Norris–LaGuardia Act as prerequisites for an injunction:

No court of the United States shall have jurisdiction to issue a temporary or permanent injunction in any case involving or growing out of a labor dispute ... except after findings of fact by the court, to the effect—

(a) That unlawful acts have been threatened and will be committed unless restrained ...;

(b) That substantial and irreparable injury to complainant's property will follow;

(c) That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;

(d) That complainant has no adequate remedy at law; and

(e) That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C. § 107. Criteria (a)—(c) are covered by a *Dataphase* analysis. With respect to the remaining prerequisites, Northwest has exhausted all remedies available to it under the RLA and has no other adequate remedy at law. Furthermore, absent a court order there are no public officers who are able to furnish adequate protection.

The testimony of Michael I. Fahey, Staff Vice–President–Labor Relations for Northwest, and the affidavit of William Slattery, Executive Vice–President of Operations for Northwest, clearly demonstrate that defendants' threatened sympathy strike will inflict substantial and irreparable injury to Northwest. Over 56% of the Northwest work force is represented by the IAM, and these IAM-represented employees are involved in critical operational functions. In the event of a strike Northwest will be forced to dramatically curtail air transportation services. In addition, Northwest competes with carriers whose employees

are not represented by the IAM. Travelers would undoubtedly turn to these carriers if Northwest's services are curtailed.

The injury to the defendants flowing from an injunction would be minimal in comparison to the harm to Northwest caused by a strike. A preliminary injunction would require the defendants to maintain the status quo and to comply with the RLA's mandatory dispute resolution procedures. District 143 and Guy Cook are not substantially harmed by an injunction. An injunction impairs the IAM only in the sense that the effectiveness of its strike against Eastern may be diminished. However, Eastern's IAM-represented employees remain free to conduct whatever secondary activity they deem appropriate for the purpose of enlisting public support for their dispute with Eastern.

Regarding Northwest's probability of success on the merits, this court has no authority to bind or influence the decision of the System Board of Adjustment. Nevertheless, the court notes that Northwest has asserted a non-frivolous position that the no-strike clauses bar its IAM-represented employees from engaging in a sympathy strike. In a previous award the System Board ruled that "in light of the no-strike provisions of the bargaining agreement [the IAM] does not retain the right to instruct its members to honor the picket lines of a sister Union." *In the matter of Northwest Airlines v. IAM*, slip op. at 11 (1970) (Robertson, Arb.) Since this award the collective bargaining agreements have been renegotiated several times, but the no-strike provisions have not changed. In addition, three of the four agreements at issue in this litigation were renegotiated after the *Burlington Northern* decision. With this background the court concludes that Northwest has a high probability of success on the merits.

Finally, although labor unions and strikes serve the public interest, in this case the policy concerns of the RLA outweigh the interests served by a sympathy strike. Maintenance of a reliable air transportation system is essential to the flow of commerce, which is in turn vital to the public interest. Northwest is the nation's fifth largest domestic carrier with hubs in the Twin Cities, Detroit and Memphis. Major disruption of Northwest's services would therefore seriously impair both business and personal travel of thousands of people.

In conclusion the court finds that Northwest has satisfied both the traditional criteria for preliminary injunctive relief and the prerequisites for an injunction set forth in the Norris–LaGuardia Act.

Accordingly, IT IS ORDERED that:

1. Defendants individually, and as officers and members and representatives of Defendant IAM, and their agents, successors, deputies, and employees and all others acting in concert or in participation with them are hereby restrained and enjoined from calling, permitting, instigating, authorizing, encouraging, participating in, approving of, or continuing any picketing, patrolling, strike, interference with equipment, sick-out, concerted refusal to work, slowdown or other unlawful activity by any Northwest IAM-represented employees against Northwest in sympathy with the economic action undertaken by defendant IAM against Eastern Airlines.

2. Defendants and Northwest shall proceed to arbitration under the terms of the collective bargaining agreements and shall comply with the Railway Labor Act's minor dispute resolution procedures in order to determine the scope and effect of the no-strike clauses.

3. Defendants shall take all necessary steps to inform all IAM officers and all IAM members who are employed by Northwest of their obligation to comply with the terms of this order.

4. Defendants shall file with this court no later than March 22, 1989, an affidavit stating the steps taken to give notice in conformity with this order, simultaneously serving a copy upon counsel for Northwest.

5. Northwest, its attorneys or any other agent designated by Northwest may serve additional true but uncertified copies of the complaint and of this order upon any of the defendants and upon any persons acting in

concert with them or otherwise acting in their aid or behalf.

6. The United States Marshal shall have the authority to enforce this order.

7. Plaintiff shall execute a bond in the amount of $2,000.

8. This order will remain in effect pending a decision by the System Board of Adjustment resolving the minor dispute between the parties.