874 F.2d 901
 131 L.R.R.M. (BNA) 2001, 57 USLW 2620,
111 Lab.Cas. P 11,097
 The LONG ISLAND RAILROAD COMPANY, Plaintiff-Appellee,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS, et al.,
Defendants-Appellants.
METRO-NORTH COMMUTER RAILROAD COMPANY, Plaintiff-Appellee,
v.
INTERNATIONAL ASSOCIATION OF MACHINISTS & AEROSPACE WORKERS
("IAM"), et al., Defendants-Appellants.
NJ TRANSIT RAIL OPERATIONS, INC., an Instrumentality of the
State of New Jersey, Plaintiff-Appellee,
v.
The BROTHERHOOD OF RAILROAD SIGNALMEN, an Unincorporated
Association, et al., Defendants-Appellants.
NATIONAL RAILROAD PASSENGER CORPORATION, Plaintiff-Appellee,
v.
AMERICAN RAILWAY & AIRWAY SUPERVISORS ASSOCIATION, F.
Ferlin, Jr., President, American Railway and Airway
Supervisors Association, A.A. D'Allesandso, System General
Chairman, American Railway and Airway Supervisors
Association, J.N. Fountain, President and General Chairman,
(OBS)-Lodge 5093, American Railway and Airway Supervisors
Association, E.J. Gutowski, General Chairman (MW), American
Railway and Airway Supervisors Association, Sherman E.
Jennings, Vice President and Vice General Chairman, ARASA
Lodge 5093, American Railway and Airway Supervisors
Association, Amtrak Service Workers Council, J.M. Parker,
Chairman, Amtrak Service Workers Council, E. Monroe, Vice
Chairman, Amtrak Service Workers Council, J. Czuczman, Vice
Chairman, Amtrak Service Workers Council, American Train
Dispatchers Association, R.J. Irvin, President, American
Train Dispatchers Association, W.A. Clifford, Vice
President, American Train Dispatchers Association, R.A.
Verdi, General Chairman, American Train Dispatchers
Association, Brotherhood of Locomotive Engineers, L.D.
McFather, President, Brotherhood of Locomotive Engineers,
R.P. McLaughlin, First Vice President, Brotherhood of
Locomotive Engineers, D.L. Lindsey, Vice President,
Brotherhood of Locomotive Engineers, G.R. DeBolt, Vice
President, Brotherhood of Locomotive Engineers, R.E.
Wiggins, Acting General Chairman, Brotherhood of Locomotive
Engineers, Brotherhood of Maintenance of Way Employees, G.N.
Zeh, President, Brotherhood of Maintenance of Way Employees,
W.E. LaRue, Vice President, Brotherhood of Maintenance of
Way Employees, J.P. Cassese, Sr., General Chairman,
Brotherhood of Maintenance of Way Employees, J. Dodd,
General Chairman, Brotherhood of Maintenance of Way
Employees, J.J. Davison, General Chairman, Brotherhood of
Maintenance of Way Employees, Brotherhood of Railroad
Signalmen, V.M. Speakman, President, Brotherhood of Railroad
Signalmen, W.A. Radziewicz, Vice President, R.E. McKenzie,
General Chairman, Brotherhood of Railroad Signalmen,
International Association of Machinists, W. Winpisinger,
International President, International Association of
Machinists, J. Peterpaul, General Vice President,
International Association of Machinists, J.E. Burns, Jr.,
President and Directing General Chairman, International
Association of Machinists, E.B. Kostakis, President and
Directing General Chairman, International Association of
Machinists, International Brotherhood of Boilermakers, Iron
Ship Builders, Blacksmiths, Forgers and Helpers, Mr. Alan M.
Scheer, International Representative, International
Brotherhood of Boilermakers, Iron Ship Builders,
Blacksmiths, Forgers and Helpers, C.W. Jones, International
President, International Brotherhood of Boilermakers, Iron
Ship Builders, Blacksmiths, Forgers and Helpers,
International Brotherhood of Electrical Workers, John J.
Barry, International President, International Brotherhood of
Electrical Workers, E.P. McEntee, International Vice
President, International Brotherhood of Electrical Workers,
P.A. Puglia, General Chairman, International Brotherhood of
Electrical Workers, J.A. McAteer, International Brotherhood
of Electrical Workers, International Representative,
International Brotherhood of Firemen and Oilers, J.L.
Walker, International President, International Brotherhood
of Firemen and Oilers, G.J. Francisco, Jr., General Chairman
and International Vice President, International Brotherhood
of Firemen and Oilers, Joint Council of Carmen, Helpers,
Coach Cleaners Apprentices, J.E. Allred, Vice President,
Brotherhood of Railroad Carmen, J. Czuczman, Chairman,
International Brotherhood of Firemen and Oilers, Railroad
Yardmasters of America, J.C. Thomas, Vice President &
General Chairman, Railroad Yardmasters of America, J.L. Roy,
Assistant to President, Director, Railroad Yardmasters of
America, Sheet Metal Workers International Association, H.W.
Randolph, Jr., General Chairman, Transportation
Communications Union, United Transportation Union, F.A.
Hardin, President, United Transportation Union, L.R. Davis,
Vice President, United Transportation Union, W.A. Beebe,
General Chairman, United Transportation Union, C.P. Jones,
General Chairman, United Transportation Union, S.F.A.
McGregor (Stewards), General Chairman, United Transportation
Union, E.J. Carlough, International President, Sheet Metal
Workers International Association, D.C. Buchanan, Director
of Railroads, Sheet Metal Workers International Association,
C.J. Welch, General Chairman, Sheet Metal Workers
International Association, Transportation Communications
Union, R.I. Kilroy, International President, Transportation
Communications Union, R.A. Scardelletti, Transportation
Communications Union, International Vice President, J.M.
Parker, General Chairman, Transportation Communications
Union, Larry J. Wotaszak, Vice President, United
Transportation Union, Defendants-Appellants.
 Nos. 1093, 1104-1106, Docket 89-7297, 89-7299, 89-7301 and 89-7303.
 United States Court of Appeals,
Second Circuit.
 Argued March 28, 1989.
Decided April 10, 1989.
 
 Joseph Guerrieri, Jr., Washington, D.C. (Richard Ruda, Samuel Issachoroff, Michael G. Dzialo, Guerrieri Edmond & James, Washington, D.C., Sheldon Engelhard, Barbara J. Olshansky, Valerie Marcus, Hannon Kolko, Vladeck, Waldman, Elias & Engelhard, P.C., Washington, D.C., Laurence Gold, AFL-CIO, Washington, D.C., Allison Beck, Associate Gen. Counsel, Intern. Ass'n of Machinists and Aerospace Workers, Washington, D.C., Roland P. Wilder, Jr., Baptiste & Wilder, Washington, D.C., of counsel), for defendants-appellants.
 Bernard M. Plum, New York City (Joseph Baumgarten, Neil H. Abramson, Proskauer Rose Goetz & Mendelsohn, New York City, of counsel), for plaintiffs-appellees, Long Island R. Co. and Metro-North Commuter R. Co.
 Sally D. Garr, Associate Gen. Counsel, Nat. R.R. Passenger Corp., Washington, D.C. (William G. Ballaine, Siff, Rosen & Parker, P.C., New York City, Morgan, Lewis & Bockius, Washington, D.C., of counsel), for plaintiff-appellee, Nat. R.R. Passenger Corp.
 Peter N. Perretti, Jr., Atty. Gen. of New Jersey, Newark, N.J. (Robert H. Stoloff, Asst. Atty. Gen., David S. Griffiths, Deputy Atty. Gen., Newark, N.J., of counsel), for plaintiff-appellee NJ Transit Rail Operations, Inc.
 Before OAKES, KEARSE and MAHONEY, Circuit Judges.
 OPINION
 MAHONEY, Circuit Judge:
 
 
 1
 Four railroads, The Long Island Railroad Company ("L.I.R.R."), Metro-North Commuter Railroad Company ("Metro-North"), NJ Transit Rail Operations, Inc. ("NJ Transit") and National Railroad Passenger Corporation ("Amtrak") (collectively the "Railroads") commenced separate actions in the United States District Court for the Southern District of New York against the International Association of Machinists and Aerospace Workers ("IAM") and various of its officers, together with numerous other unions named in the caption and various of their officers (collectively, sometimes including the IAM and its named officers, the "Unions"). The Unions, including IAM, represent employees of the Railroads. The IAM is on strike against Eastern Air Lines, Inc. ("Eastern"), and had expressed an intention to picket the Railroads. These actions seek injunctive relief requiring the Unions not to honor picket lines established by the IAM at the Railroads.
 
 
 2
 This appeal is taken from preliminary injunctions entered in the United States District Court for the Southern District of New York, Robert P. Patterson, Jr., Judge, which restrain the Unions, "their officers, agents, representatives and the employees represented by them, and all those in active concert or participation with them who receive notice of this [injunction]," from participating in "any ... interruption in the operation of [L.I.R.R., Metro-North or NJ Transit] by and among any of [their] employees," or in the case of Amtrak, from participating in "concerted labor activity disruptive of Amtrak's normal rail operations." All of the preliminary injunctions provided that they were not to be construed to inhibit secondary picketing and other lawful strike activities by members of the IAM who are not employees of the Railroads.
 
 
 3
 We have jurisdiction of this interlocutory appeal pursuant to 28 U.S.C. Sec. 1292(a)(1) (1982). A motion to expedite the appeal has previously been granted, see 29 U.S.C. Sec. 110 (1982 & Supp. IV 1986), a motion to allow memoranda in excess of ten pages in support of a motion for stay pending appeal was implicitly granted by acceptance of the memoranda for filing, and a motion for consolidation of the appeals is hereby granted.
 
 
 4
 We modify the preliminary injunctions as hereinafter specified with respect to their impact upon individual employees represented by the Unions, and affirm the orders granting the preliminary injunctions, as modified. We deny the Unions' motion for a stay of said orders pending appeal.
 
 Background
 
 5
 On March 4, 1989, the IAM commenced a lawful strike against Eastern after exhausting without settlement the pertinent procedures mandated by the Railway Labor Act ("RLA"), 45 U.S.C. Secs. 151-188 (1982), for negotiating changes in their collective bargaining agreement.[1] On February 2, 1989, the IAM informed the National Mediation Board of its general plans to engage in secondary picketing in the air, rail and manufacturing industries in connection with any strike against Eastern, and expressed at the outset of the Eastern strike its specific intention to picket the Railroads commencing Monday, March 6, 1989. The IAM actively sought support from the Unions in urging, encouraging and instructing their members to honor the IAM picket lines. The Unions stipulated in hearings below that if IAM picket lines are established at the Railroads, the Unions will encourage union members to honor them; that if the Unions encourage their members to honor the picket lines, the members are unlikely to cross them; and that if the employees do not cross the picket lines, the Railroads will be forced to cease operations. The evidence established that members of at least some of the Unions who disobeyed Union directives to honor picket lines would be subject to discipline through imposition of fines and expulsion from Union membership. Some Union representatives also intimated that injury to person and property could result from crossing picket lines set up by the IAM.
 
 
 6
 Evidence was also presented below that since most of the Unions represent employees of all four Railroads, and Amtrak interconnects and shares facilities with all of the other Railroads, the refusal of one union to cross IAM picket lines against any one of the Railroads could, in all probability, cause all of the Railroads to cease operations. Moreover, because of the operational interrelationship between Amtrak's intercity service and local commuter services, a refusal to cross IAM picket lines by any Union would likely prevent all passenger rail traffic from moving between cities in the northeast, and to some extent elsewhere.
 
 
 7
 On March 4, 1989, the L.I.R.R., Metro-North and NJ Transit moved for a temporary restraining order enjoining the Unions representing their employees from honoring the threatened IAM picket lines. On March 5, 1989, the district court held a six-hour hearing and issued temporary restraining orders granting the requested relief. On March 6, 1989, the court conducted a hearing and issued a temporary restraining order on a similar application by Amtrak.
 
 
 8
 A motion to the district court by the Unions to stay the orders pending appeal was denied. An appeal was then taken to this court, and the Unions promptly moved for expedited consideration of their emergency appeal, a stay of the temporary restraining orders pending appeal, and a writ of mandamus directing the district court to vacate the temporary restraining orders. This court denied the application for mandamus and noted that the matter of the temporary restraining orders could be reviewed after decision on the motions for preliminary injunctions.
 
 
 9
 The Railroads subsequently moved for preliminary injunctions in the district court. On March 13, 1989, the district court issued an Opinion and Order granting the Railroads' motion for preliminary injunctions "restraining [the Unions] from engaging in sympathy strikes, slowdowns, or other concerted labor activity, in connection with any picketing of plaintiffs by IAM's Eastern Air Lines members during the pendency of the Eastern Air Line/IAM strike." The Long Island Rail Road Co. v. International Ass'n of Machinists, 709 F.Supp. 376, 388-89 (S.D.N.Y.1989). The injunctions were issued March 17, 1989 and filed March 20, 1989.
 
 
 10
 The preliminary injunctions were issued upon the district court's finding that there existed (1) a substantial likelihood that the Railroads would succeed on the merits, and (2) a clear risk of immediate and irreparable injury to the Railroads and the public that outweighed any hardship to the Unions. Regarding success on the merits, the district court noted that none of the pertinent collective bargaining agreements contained "no strike" clauses or provisions expressly permitting or prohibiting the honoring of picket lines.[2] At 382. Nonetheless, the court found that the agreements were "reasonably susceptible to the plaintiffs' interpretation that there is no right of defendants to engage in the contemplated sympathetic action under any of the collective bargaining agreements in issue," id. at 384, with the result that an arbitrable dispute existed as to whether the Unions had a right to encourage a secondary strike, id. at 386. The court determined that it had jurisdiction under the RLA to enjoin the strike pending compliance with the mandated RLA procedures, id. at 388, and that the stated purpose of the RLA "to avoid any interruption to commerce or to the operation of any carrier," see 45 U.S.C. Sec. 152 First (1982), together with the Act's imposition of a duty to exhaust settlement procedures, would be a "nullity" if a temporary injunction did not issue, id. at 385.
 
 
 11
 Regarding harm to the Railroads, the court found that the cessation of plaintiffs' rail operations would result in immediate and irreparable injury to them in the form of economic losses and the loss of good will not compensable in monetary damages. Id. at 388. The court also found additional damage to the commuting public in the form of economic loss and inconvenience. Id. at 388-89. The court determined that these injuries decidedly outweighed the Unions' hardship in not being able to express solidarity with the IAM in its dispute with Eastern. Id. at 389.
 
 
 12
 The district court's preliminary injunctions, some of whose provisions have already been described above, required the Unions to (1) rescind and withdraw prior "orders, directions, requests or suggestions" that any IAM picket lines be honored; (2) communicate the provisions of the injunctions to the employees whom they represent, including the posting of notices; and (3) "take all affirmative steps necessary to prevent disruption of normal rail operations."
 
 
 13
 The Unions then moved to stay the preliminary injunctions pending appeal, which motion the district court denied. The defendants thereafter moved this court for an expedited appeal, a stay pending appeal, and consolidation of the four appeals. Those motions are determined as hereinabove indicated.
 
 Discussion
 
 14
 On an appeal from the grant of a preliminary injunction, we disturb the relief afforded by the district court only upon a showing either of abuse of the district court's discretion, see Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975), or a clear mistake of law, see Seaboard World Airlines, Inc. v. Tiger Int'l, Inc., 600 F.2d 355, 360 (2d Cir.1979); see also Consolidated Rail Corp. v. Brotherhood of Maintenance of Way Employees, 792 F.2d 303, 304-05 (2d Cir.1986) (vacating preliminary injunction enjoining secondary picketing because of district court's clear legal error); Emery Air Freight Corp. v. Local Union 295, 449 F.2d 586, 591 (2d Cir.1971) (same), cert. denied, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972).
 
 
 15
 A. The Railway Labor Act and the Norris-LaGuardia Act.
 
 Section 2 First of the RLA provides:
 
 16
 It shall be the duty of all carriers ... and [their] employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.
 
 
 17
 45 U.S.C. Sec. 152 First (1982); see Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. 570, 575-77, 91 S.Ct. 1731, 1734-35, 29 L.Ed.2d 187 (1971) (RLA Sec. 2 First expresses legal mandate rather than policy exhortation). In order to carry out this purpose, the RLA establishes elaborate procedures for resolving disputes in the industries to which it applies.
 
 
 18
 The Norris-LaGuardia Act, 29 U.S.C. Secs. 101-115 (1982 & Supp. IV 1986), is in tension with the RLA. Section 1 of the Norris-LaGuardia Act provides:
 
 
 19
 No court of the United States ... shall have jurisdiction to issue any restraining order or temporary or permanent injunction in a case involving or growing out of a labor dispute, except in a strict conformity with the provisions of [the Norris-LaGuardia Act]; nor shall any such restraining order or temporary or permanent injunction be issued contrary to the public policy declared in [the Norris-LaGuardia Act].
 
 
 20
 29 U.S.C. Sec. 101 (1982).
 
 
 21
 The Supreme Court has accommodated the competing demands of the RLA and the Norris-LaGuardia Act by holding that the latter " 'does not deprive the federal court of jurisdiction to enjoin compliance with various mandates of the Railway Labor Act.' " Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 445, 107 S.Ct. 1841, 1851, 95 L.Ed.2d 381 (1987) (quoting International Ass'n of Machinists v. Street, 367 U.S. 740, 772, 81 S.Ct. 1784, 1801, 6 L.Ed.2d 1141 (1961)). As the Court more fully stated in Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 77 S.Ct. 635, 1 L.Ed.2d 622 (1957):
 
 
 22
 We hold that the Norris-LaGuardia Act cannot be read alone in matters dealing with railway labor disputes. There must be an accommodation of that statute and the Railway Labor Act so that the obvious purpose in the enactment of each is preserved. We think that the purposes of these Acts are reconcilable.
 
 
 23
 Id. at 40, 77 S.Ct. at 640.
 
 
 24
 The RLA creates an elaborate arbitration and mediation process designed to settle all "major" and "minor" disputes between a carrier and its employees. See Elgin J. & E. Ry. Co. v. Burley, 325 U.S. 711, 722-28, 65 S.Ct. 1282, 1289-92, 89 L.Ed. 1886 (1945), aff'd on rehearing, 327 U.S. 661, 66 S.Ct. 721, 90 L.Ed. 928 (1946); see also Local 553, Transp. Workers Union v. Eastern Air Lines, Inc., 695 F.2d 668, 673 (2d Cir.1983). Minor disputes grow out of "grievances or ... the interpretation or application of agreements concerning rates of pay, rules or working conditions," 45 U.S.C. Sec. 153 First (i)(1982), and are subject to arbitration before the National Railroad Adjustment Board. 45 U.S.C. Sec. 153 (1982). Generally speaking, major disputes are those "concerning changes in rates of pay, rules, or working conditions," 45 U.S.C. Sec. 155 First (a)(1982), and are subject to mediation before the National Mediation Board if not adjusted by the parties in conference. Id. Minor disputes are finally determined by binding arbitration before the Adjustment Board, however, whereas major disputes which are not resolved by mediation before the Mediation Board may ultimately lead to self help, including strikes, as occurred in the IAM/Eastern situation. See supra note 1.
 
 
 25
 The requirement of arbitration for minor disputes is an integral part of the RLA policy to avoid interruption to commerce by the transportation industries. See Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 36, 77 S.Ct. 635, 638, 1 L.Ed.2d 622 (1957). That case answered in the negative the question "whether a railway labor organization can resort to a strike over matters pending before the Adjustment Board," id. at 31, 77 S.Ct. at 636, and determined that the Norris-LaGuardia Act does not preclude injunctive relief to bar such a strike, id. at 39-42, 77 S.Ct. at 639-41. Similarly, an anti-strike injunction may issue against strike activity undertaken prior to initiation of the statutory procedures. Long Island R.R. Co. v. System Federation No. 156, 368 F.2d 50 (2d Cir.1966).
 
 
 26
 The Unions contend, however, that the sympathy strike which they propose is not a "dispute" between the Unions and the Railroads, and therefore is not subject to the resolution procedures of the RLA. Their claim is not without case support. See Eastern Air Lines, Inc. v. Air Lines Pilots Ass'n, Int'l, No. 89-5229 (11th Cir. March 24, 1989) ("[o]rdinarily, it is lawful to honor picket lines, and the RLA does not unambiguously preclude sympathy strikes"); Brotherhood of Locomotive Firemen & Enginemen v. Florida East Coast Ry. Co., 346 F.2d 673, 675-76 (5th Cir.1965) (sympathy strike treated as part of provoking major dispute which had reached stage of permissible self-help); Arthur v. United Air Lines, Inc., 655 F.Supp. 363, 367 (D.Colo.1987) (unlawful under RLA to terminate non-union employees who sympathy strike absent evidence that terminations necessary to prevent disruption of vital transportation services); Western Maryland R.R. Co. v. System Bd. of Adjustment, 465 F.Supp. 963, 975 (D.Md.1979) (sympathy strike not enjoinable under RLA); Northwest Airlines, Inc. v. Transport Workers Union, 190 F.Supp. 495, 498 (W.D.Wash.1961) (sympathy strike treated as aspect of another union's major dispute).
 
 
 27
 Other courts, however, have held that a sympathy strike presents a dispute subject to RLA resolution procedures, and is accordingly enjoinable. See Trans Int'l Airlines, Inc. v. International Bhd. of Teamsters, 650 F.2d 949 (9th Cir.1980) (sympathy strike by employees subject to "no strike" clause enjoined under RLA pending determination of contractual rights pursuant to minor dispute resolution procedures), cert. denied, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981); Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 442 F.2d 246 (8th Cir.1970), aff'd on rehearing, 442 F.2d 251 (8th Cir.) (sympathy strike enjoinable under minor dispute resolution procedures of RLA notwithstanding absence of "no strike" clause, because contract may arguably be interpreted as implicitly prohibiting honoring of picket lines), cert. denied, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971); Chicago & Illinois Midland Ry. Co. v. Brotherhood of R.R. Trainmen, 315 F.2d 771 (7th Cir.) (sympathy strike enjoinable where no effort made to comply with minor dispute resolution procedures of RLA), vacated as moot, 375 U.S. 18, 84 S.Ct. 61, 11 L.Ed.2d 39 (1963); Northwest Airlines, Inc. v. International Ass'n of Machinists, 712 F.Supp. 732 (D.Minn.1989) (sympathy strike enjoinable under RLA where collective bargaining agreement includes "no strike" clause); International Ass'n of Machinists v. Airline Indus. Relations Conf., Civ. 89-0514 (D.D.C. March 16, 1989) (same); South Eastern Pa. Transp. Auth. v. International Ass'n of Machinists, 708 F.Supp. 659 (E.D.Pa.1989) (same); Trans World Airlines v. International Ass'n of Machinists, 629 F.Supp. 1554 (W.D.Mo.1986) (same).
 
 
 28
 While the Unions' underlying reason for striking may be directed at Eastern rather than the Railroads, the Unions' assertion of a right to sympathy strike effectively renders the dispute one between the Railroads and the Unions over whether their collective bargaining agreements allow sympathy strikes. That dispute should be arbitrated under the minor dispute resolution procedures of the RLA.
 
 
 29
 Given (1) the requirements of 45 U.S.C. Sec. 152 First, which expresses a legal mandate rather than a policy exhortation, Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. 570, 575-76, 91 S.Ct. 1731, 1734-35, 29 L.Ed.2d 187 (1971), that the parties both "make and maintain agreements concerning rates of pay, rules, and working conditions" and "settle all disputes, whether arising out of the application of such agreements or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier;" and (2) the elaborate procedures provided by the RLA for the resolution of disputes between employers and unions subject to its governance, we agree with the district court and the weight of authority cited above that the unions here may not engage in a sympathy strike without first exhausting the applicable RLA procedures.
 
 
 30
 It is true that the collective bargaining agreements between the Unions and the Railroads generally do not include a "no strike" clause. But see supra note 2. Thus, any proscription on sympathy strikes must be implied from less specific language of the collective bargaining agreements and the practices of the parties. This fact does not preclude arbitration of the dispute pursuant to the RLA procedures, however, although it may decrease the Railroads' likelihood of prevailing on the underlying dispute. To determine whether an arbitrable minor dispute is presented, we must ascertain whether a "plausible interpretation" of the collective bargaining agreement is presented by the party seeking arbitration. Local 553, Transport Workers Union v. Eastern Air Lines, Inc., 695 F.2d 668, 673 (2d Cir.1983); see United Transp. Union v. Burlington Northern, Inc., 458 F.2d 354, 357 (8th Cir.1972) ("the test to be applied is that if the contract is reasonably susceptible to the interpretations sought by both the carrier and union, the dispute is minor and within exclusive adjustment jurisdiction"); Railway Labor Executives Ass'n v. Norfolk & Western Ry. Co., 833 F.2d 700, 705 (8th Cir.1987) ("if there is any doubt as to whether a dispute is major or minor a court will construe the dispute to be minor").
 
 
 31
 We note that most of the cases which have held the sympathy strike issue subject to arbitration dealt with collective bargaining agreements that included a "no strike" clause, e.g., Trans Int'l Airlines, Inc. v. International Bhd. of Teamsters, 650 F.2d 949 (9th Cir.1980), cert. denied, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981), but some did not, e.g., Northwest Airlines, Inc. v. Air Line Pilots Ass'n, Int'l, 442 F.2d 246 (8th Cir.1970), aff'd on rehearing, 442 F.2d 251 (8th Cir.), cert. denied, 404 U.S. 871, 92 S.Ct. 70, 30 L.Ed.2d 116 (1971). After a review of the record and an evidentiary hearing, which included examination not only of the pertinent agreements but also of such "incidents of employment" as arbitration awards, operating rules and attendance policies, 709 F.Supp. at 382-83, the district court found that the "collective bargaining agreements contain a variety of affirmative obligations of the employer and the union employees involved, which assume a regular and on-going working relationship," id. at 386, and concluded that "the collective bargaining agreements are reasonably susceptible to the plaintiffs' interpretation that there is no right of defendants to engage in the contemplated sympathetic action under any of the collective bargaining agreements in issue," id. at 384. We agree. Consequently, the disputes are arbitrable and the preliminary injunctions were properly entered.
 
 
 32
 Finally, the Unions' reliance on Buffalo Forge Co. v. United Steelworkers, 428 U.S. 397, 96 S.Ct. 3141, 49 L.Ed.2d 1022 (1976), as precluding issuance of an injunction is misplaced. That case, which declined to enjoin a sympathy strike pending contractual arbitration of the union's right to engage in the strike, was decided under the National Labor Relations Act, under which " '[t]here is no general federal anti-strike policy,' " Id. at 409, 96 S.Ct. at 3148 (quoting Sinclair Refining Co. v. Atkinson, 370 U.S. 195, 225, 82 S.Ct. 1328, 1344, 8 L.Ed.2d 440 (1962) (Brennan, J., dissenting)). Here, on the contrary, the RLA governs, and the major purpose of the passage of the RLA was to prevent strikes in the transportation industries subject to its governance. Detroit & Toledo Shore Line R.R. Co. v. United Transp. Union, 396 U.S. 142, 148 & n. 13, 90 S.Ct. 294, 298 & n. 13, 24 L.Ed.2d 325 (1969). Buffalo Forge is therefore inapposite in the RLA context, as other courts have concluded. See, e.g., Trans Int'l Airlines, Inc. v. International Bhd. of Teamsters, 650 F.2d 949, 965-66 (9th Cir.1980), cert. denied, 449 U.S. 1110, 101 S.Ct. 918, 66 L.Ed.2d 839 (1981).
 
 
 33
 B. Burlington Northern.
 
 
 34
 The Unions nonetheless contend that forbidding a sympathy strike here is contrary to the principle established by Burlington Northern R.R. Co. v. Brotherhood of Maintenance of Way Employes, 481 U.S. 429, 107 S.Ct. 1841, 95 L.Ed.2d 381 (1987), where the Court held that the RLA placed no bar on secondary picketing by a union which had exhausted RLA settlement procedures with the employer, and sought to picket railroads other than the employer in the primary dispute. The district court ruled that Burlington Northern authorizes the picketing of the Railroads by IAM representatives who are employees of Eastern, rather than the Railroads, and the preliminary injunctions entered below specifically so provides.[3] The Railroads have not challenged this portion of the court's ruling.
 
 
 35
 We agree that it is somewhat anomalous that secondary picketing is allowed by Burlington Northern, but considerably undercut in its effectiveness by the type of injunction entered here. See Arthur v. United Air Lines, Inc., 655 F.Supp. 363, 367-68 (D.Colo.1987) (effectiveness of self-help diminished); Western Maryland R.R. Co. v. System Bd. of Adjustment, 465 F.Supp. 963, 975 (D.Md.1979) ("without the expectation that picket lines would be honored, picketing is of little practical effect"). This results, however, from the need to reconcile a primary union's right to engage in the full extent of economic self help with a secondary union's own RLA obligations. The difficulty is partially reduced by the fact that unions which have exhausted their RLA responsibilities may still enlist for support third parties not subject to the strictures of the RLA.[4]
 
 
 36
 More importantly, it seems a greater anomaly to conclude that the detailed procedures of the RLA, whose explicitly stated purpose is to prevent interruptions to commerce and the operation of transportation carriers, are inoperative when a union which has made no pretense of complying with those procedures seeks to strike in the face of an employer contention that engaging in the strike violates their collective bargaining agreement. We see no reason why a union should be accorded greater rights to engage in a sympathy strike to apply pressure against another employer than it has to engage in a primary strike against the employer of its own members. If the RLA prohibits a primary strike pending arbitration, then a secondary strike should also be barred.
 
 
 37
 We do not view the ruling in Burlington Northern as establishing a contrary principle. Although the Supreme Court there concluded that the primary union may " 'employ the full range of whatever peaceful economic power [it] can muster,' " the Court began with the recognition that the parties " 'ha[d] unsuccessfully exhausted the Railway Labor Act's procedures.' " 481 U.S. at 447, 107 S.Ct. at 1852 (quoting Brotherhood of R.R. Trainmen v. Jacksonville Terminal Co., 394 U.S. 369, 392-93, 89 S.Ct. 1109, 1123-24, 22 L.Ed.2d 344 (1969)). Thus, while a union which has unsuccessfully exhausted the RLA's dispute resolution procedures may picket, we see nothing in Burlington Northern that would permit a secondary union to honor the picket line if that action would independently violate its own congressionally mandated obligations under the RLA.
 
 
 38
 C. Preliminary Relief.
 
 
 39
 To prevail in their applications for preliminary injunctions, the Railroads must show (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. Jackson Dairy, Inc. v. H.P. Hood & Sons, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). In making the determination of irreparable harm, both harm to the parties and to the public may be considered. See New York Pathological X-Ray Laboratories, Inc. v. INS, 523 F.2d 79, 81 (2d Cir.1975); United States v. City of New Haven, 447 F.2d 972, 974 (2d Cir.1971); see also 29 U.S.C. Sec. 107 (1982) (specifying Norris-LaGuardia criteria for issuance of temporary or permanent injunctive relief in "any case involving or growing out of a labor dispute").
 
 
 40
 The district court found that there was a risk of immediate and irreparable injury to the Railroads and the public, and that there was a substantial likelihood that the Railroads would prevail on the merits. These determinations will not be reversed absent an abuse of discretion. Doran v. Salem Inn, Inc., 422 U.S. 922, 931-32, 95 S.Ct. 2561, 2567-68, 45 L.Ed.2d 648 (1975).
 
 
 41
 The finding that the Railroads and the general public would sustain irreparable harm should a strike occur is not clearly erroneous. Although the Unions would be precluded from expressing solidarity with another union by honoring its picket line, the immediate and irreparable harm to the Railroads and the public resulting from a general cessation in railroad service surpasses that of the Unions. Similarly, because we agree that the collective bargaining agreements are susceptible to the Railroads' interpretation, we conclude that the district court did not err in finding a likelihood of success on the merits. Accordingly, we find no error in the order granting the preliminary injunctions, with one modification.
 
 
 42
 Although the preliminary injunctions correctly proscribe the Unions' encouragement of activity by Railroad employees in support of a sympathy strike, the injunctions in behalf of the L.I.R.R., Metro-North and NJ Transit could be read to enjoin the activities of Railroad employees not acting in concert. Those injunctions all restrain "the employees represented" by the Unions from participating in "any ... interruption in the operation of [L.I.R.R., Metro-North or NJ Transit] by and among any of [their] employees." The Amtrak injunction, in contrast, prohibits only employee participation in "concerted labor activity disruptive of Amtrak's normal rail operations."
 
 
 43
 We believe that the other preliminary injunctions should be revised to conform to the Amtrak model. The Opinion and Order of the district court, pursuant to which the preliminary injunctions were issued, called only for "a temporary injunction ... restraining defendants from engaging in sympathy strikes, slowdowns, or other concerted labor activity, in connection with any picketing of plaintiffs by IAM's Eastern Air Lines members during the pendency of the Eastern Air Line/IAM strike." 709 F.Supp. at 389 (emphasis added). In addition, individual employees represented by the Unions are not parties to these actions, and may be subjected to the restraints of the injunctions only if "in active concert or participation" with parties thereto. Fed.R.Civ.P. 65(d); see Chicago & Illinois Midland Ry. Co. v. Brotherhood of R.R. Trainmen, 315 F.2d 771, 773 n. 2 (7th Cir.) (approving injunction exempting individual employee refusals to work), vacated as moot, 375 U.S. 18, 84 S.Ct. 61, 11 L.Ed.2d 39 (1963). In any event, the variation between the injunctions issued below appears inadvertent.
 
 
 44
 Finally, we approve those provisions of the injunctions which require affirmative actions of the Unions in (1) rescinding and withdrawing prior "orders, directions, requests or suggestions" that any IAM picket lines be honored, (2) communicating the provisions of the injunctions to the employees whom they represent, including the posting of notices, and (3) "tak[ing] all affirmative steps necessary to prevent disruption of normal rail operations." In view of the evidence cited by the district court concerning prior encouragement by the Unions of the anticipated sympathy strikes, it was not an abuse of discretion to order this relief. See NLRB v. Nashville Bldg. & Const. Trades Council Local 429, 425 F.2d 385, 392 (6th Cir.1970); NLRB v. Teamsters Local Union 327, 419 F.2d 1282, 1284 (6th Cir.1970).
 
 Conclusion
 
 45
 Consistent with the foregoing, the orders granting the preliminary injunctions are affirmed, with the modification that the L.I.R.R., Metro-North and NJ Transit injunctions shall be amended to specify that, as to the represented employees, only concerted activity is prohibited. The various motions to this court are determined as hereinabove indicated.
 
 
 
 [1]
 The IAM and Eastern had been negotiating changes in their collective bargaining agreement since November, 1987. On February 1, 1989, the National Mediation Board released the parties from mediation after declaring the negotiations to be at an impasse. Eastern rejected an offer of binding arbitration made by the Board pursuant to 45 U.S.C. Sec. 155 First (1982). On February 24, 1989, the Board recommended to the President of the United States that he appoint an emergency board pursuant to 45 U.S.C. Sec. 160 (1982) because the IAM-Eastern dispute "threaten[s] substantially to interrupt interstate commerce." Id. On March 3, 1989, the President indicated his intention not to appoint an emergency board. On March 4, 1989, following expiration of the thirty-day "cooling off" period mandated by 45 U.S.C. Sec. 155 First (1982), the IAM struck Eastern
 
 
 [2]
 The record includes evidence that agreements between the L.I.R.R. and two supervisory unions may contain "no strike" clauses, but this does not materially alter the overall situation
 
 
 [3]
 The secondary picketing in Burlington Northern was closer to home, in the sense that it occurred within the same (railroad) industry
 
 
 [4]
 We note in this regard that the RLA does not preclude the Unions from enlisting the support of unions not covered by the RLA, see Buffalo Forge, 428 U.S. at 407-09, 96 S.Ct. at 3147-48 (court has no jurisdiction to enjoin sympathy strike by non-RLA union pending outcome of arbitration under collective bargaining agreement), the public, see Burlington Northern, 481 U.S. at 452, 107 S.Ct. at 1855 ("pressures of informed public opinion" part of economic self help) (quoting Chicago & North Western Ry. Co. v. United Transp. Union, 402 U.S. 570, 597-98, 91 S.Ct. 1731, 1745-46, 29 L.Ed.2d 187 (1971) (Brennan, J., dissenting)), or individual employees not acting in concert